**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| Commodity Futures Trading Commission,<br><br>Plaintiff,<br><br>v.<br><br>Adam Todd, Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation (d/b/a Digitex Futures)<br><br>Defendants. | **CIVIL ACTION NO:**<br><br>**Hon.**_____<br><br>**Jury Trial Demanded** |

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND
CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT
AND COMMISSION REGULATIONS**

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), an independent federal agency, alleges as follows:

## I.  SUMMARY

1.      Between December 2017 and the present, (the "Relevant Period"), Defendant Adam Todd ("Todd") owned, built, and operated an illegal digital asset derivatives trading platform through a common enterprise of corporate entities including Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation.  This complaint refers collectively to the entity Defendants listed in the preceding sentence as "Digitex Futures" and the web-based exchange as the "Exchange."  Through the operation of the Exchange and the activities described in greater detail below, Digitex Futures and Todd violated applicable

sections of the Commodity Exchange Act ("Act" or "CEA"), 7 U.S.C. §§ 1–26, and Commission Regulations promulgated thereunder ("Regulations"), 17 C.F.R. Pts. 1–190 (2021).

2.     The Exchange operated from no later than July 31, 2020, the date of its "launch," through at least May 2022, the approximate date Digitex Futures removed the trading interface from its website (the "Exchange Period").  During the Exchange Period, Digitex Futures accepted customer funds as margin and matched customer orders for digital asset derivatives such as bitcoin futures contracts and ether futures contracts.  In connection with its offering of digital asset futures contracts, Digitex Futures allowed users, including customers located in the United States, to trade with leverage of up to 100 to 1.

3.     Through the operation of the Exchange, Digitex Futures became subject to the requirements under Section 4 of the Act, 7 U.S.C. § 6, to register with the Commission as a designated contract market ("DCM") or foreign board of trade ("FBOT"), as well as the requirement under Section 4d of the Act, 7 U.S.C. § 6d, to register as a futures commission merchant ("FCM").  Digitex Futures and Todd have never been registered with the Commission in any capacity and therefore violated 7 U.S.C. §§ 6 and 6d.

4.     Because Digitex Futures also met the statutory definition of an FCM, Regulation 42.2, 17 C.F.R. § 42.2 (2021), required it to comply with applicable provisions of the Bank Secrecy Act ("BSA"), including requirements to implement effective know-your-customer ("KYC") procedures and a customer information program ("CIP").  However, Digitex Futures did not have effective KYC procedures at any time nor did it implement an effective CIP, thus violating 17 C.F.R. § 42.2.

5.     Digitex Futures' business model, memorialized in a "white paper" penned by Todd, promised an exchange with commission-free trading.  To realize this "futures trader's Utopian

dream," Digitex Futures planned to require users to margin all trading activity on the Exchange with its "native currency," a digital asset with the symbol DGTX.

6.      Digitex Futures was the sole initial source of DGTX.  Beginning no later than January 2018, Digitex Futures sold DGTX tokens directly to market participants; although once sold by Digitex Futures, DGTX subsequently traded in the secondary market on third-party digital asset exchanges.

7.      In addition to the registration and regulatory violations described above, between approximately May 1, 2020 and at least August 15, 2020 (the "Attempted Manipulation Period"), Todd attempted to manipulate the price of DGTX by engaging in non-economic trading activity—here, trading that was expected to lose money rather than make money—on third-party digital asset trading platforms with the intent to artificially inflate (or "pump") the price of DGTX to increase the value of the DGTX tokens held by Todd and Digitex Futures and to benefit Digitex Futures by attempting to legitimize its "native currency."  Todd's attempted manipulation of DGTX violated Section 6(c)(1), 6(c)(3), and 9(a)(2) of the Act, 7 U.S.C. §§ 9(1), 9(3), and 13(a)(2), and Regulations 180.1(a)(1) and 180.2, 17 C.F.R. §§ 180.1(a)(1), 180.2 (2021).

8.      Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this complaint and similar acts and practices, as more fully described below.

9.      Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-l, to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act.  In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, restitution, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.  JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c of the CEA, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

11.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants transacted business in the Southern District of Florida, and Defendants engaged in acts and practices in violation of the CEA and Regulations within this District.

## III.  PARTIES

### A.  The CFTC

12.     Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the CEA and Regulations promulgated thereunder.

### B.  Defendants

13.     **Digitex Limited**, **Digitex Software Limited**, **Blockster Holdings Limited**, and **Digitex LLC** are a common enterprise of corporate entities that comprise Digitex Futures, as defined above, which operated the Exchange from an office in Miami, Florida.  None of the entities comprising Digitex Futures has ever been registered with the Commission in any capacity.  Digitex Limited was registered in the Republic of Seychelles on December 11, 2017.  Digitex Software Limited was registered in Ireland on March 8, 2018, and operated in Dublin with a small staff of

software developers for several months.  At all times relevant to the Proposed Complaint, Todd

owned Digitex Limited and Digitex Software Limited.  Since at least January 27, 2021, Todd has

co-owned Blockster Holdings Limited, a Gibraltar entity.  On April 27, 2021, Todd and Blockster

Holdings Limited applied to form Digitex LLC in St. Vincent & the Grenadines.

14.     Defendant **Adam Todd** is a natural person who resides in Miami, Florida.  Todd is

the founder and CEO of Digitex Futures.  Todd owned and controlled all of the entities comprising

Digitex Futures at all times relevant to this complaint.  Todd has never been registered with the

Commission in any capacity.

### IV.     STATUTORY BACKGROUND AND LEGAL FRAMEWORK

15.     The purpose of the CEA is to "serve the public interests . . . through a system of

effective self-regulation of trading facilities, clearing systems, market participants and market

professionals under the oversight of the Commission," as well as "to deter and prevent price

manipulation or any other disruptions to market integrity; to ensure the financial integrity of all

transactions subject to [the] Act and the avoidance of systemic risk; to protect all market

participants from fraudulent or other abusive sales practices and misuses of customer assets; and

to promote responsible innovation and fair competition among boards of trade, other markets and

market participants."  Section 3 of the Act, 7 U.S.C. § 5.

16.     Derivatives are financial instruments such as futures, options, or swaps that derive

their value from something else, like a benchmark or a physical commodity.  The CEA requires

that, subject to certain exemptions, commodity derivative transactions must be conducted on

exchanges designated by, or registered with, the CFTC.  For example, trading of commodity

futures contracts must be conducted on a board of trade designated by the CFTC as a contract

market or on a registered foreign board of trade.  Section 4 of the Act, 7 U.S.C. § 6; Regulation 48.3, 17 C.F.R. § 48.3 (2021).

17.     A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights.  Digital assets include virtual currencies, such as bitcoin or ether, which are digital representations of value that function as mediums of exchange, units of account, and/or stores of value.  Certain digital assets are "commodities," including those alleged herein, as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

18.     Some digital assets function as "native"  tokens or currencies, which are designed to have specific uses on particular platforms or applications, similar to a poker chip in a casino.

19.     In recent years, as digital asset markets have evolved, the CFTC has approved the offer of futures contracts, including bitcoin and ether futures and options, on certain digital assets by boards of trade registered with the CFTC such as the Chicago Mercantile Exchange and Chicago Board Options Exchange.

20.     The provisions of the Act and Regulations that apply to DCMs—i.e., the markets where trading of U.S. futures is required to occur—establish important protections for United States derivatives markets and market participants. For example, DCMs must conform to core principles that are designed to achieve the prevention of market abuse, Section 5(d)(12)(A) of the Act, 7 U.S.C. § 7(d)(12)(A); ensure their financial stability, Section 5(d)(21) of the Act, 7 U.S.C. § 7(d)(21); protect their information security, Regulation 38.1051(a)(2), 17 C.F.R. § 38.1051(a)(2) (2021); and safeguard their systems in the event of a disaster, Regulation 38.1051(a)(3), 17 C.F.R. § 38.1051(a)(3) (2021)  Further, DCMs must ensure that the contracts they list for trading are "not readily susceptible to manipulation," Section 5(d)(3) of the Act, 7 U.S.C. § 7(d)(3); DCMs must "prevent market disruption," Section 5(d)(4) of the Act,7 U.S.C. § 7(d)(4); DCMs must impose

position limits designed to reduce the potential threat of market manipulation or congestion, Section 5(d)(5) of the Act, 7 U.S.C. § 7(d)(5); DCMs must establish and enforce rules to minimize conflicts of interest, Section 5(d)(16) of the Act,7 U.S.C. § 7(d)(16); and DCMs must maintain and retain important records and provide them to the Commission, Section 5(d)(18) of the Act, 7 U.S.C. § 7(d)(18).

21.     An FCM is an individual, association, partnership, corporation, or trust that is: (i) engaged in soliciting or in accepting orders for regulated transactions, including futures, swaps, commodity options, or retail commodity transactions; or (ii) acts as a counterparty to retail commodity transactions; and (iii) which, in connection with these activities, "accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom."   Section 1a(28)(A) of the Act, 7 U.S.C. § 1a(28)(A).

22.     FCMs can accept and hold customer funds to margin commodity derivative transactions.   They are a critical component of the U.S. financial system, and therefore must comply with applicable requirements under the Act and Regulations.   Among the most fundamental of these requirements is Section 4d(a) of the Act, 7 U.S.C. § 6d(a), which makes it illegal for any person to act as an FCM unless registered as such with the Commission.   FCMs must establish safeguards to prevent conflicts of interest, Section 4d(c) of the Act, 7 U.S.C. § 6d(c); segregate customer assets to protect them from the risk of the FCM's insolvency, Section 6d(a)(2) of the Act; 7 U.S.C. § 6d(a)(2); and employ only salespeople who register with the CFTC and meet strict proficiency requirements, Section 4k(1) of the Act, 7 U.S.C. § 6k(1).

23.     Regulation 42.2, 17 C.F.R. § 42.2 (2021), requires, among other things, that every FCM shall comply with applicable provisions of the Bank Secrecy Act ("BSA"), regulations

promulgated by the Department of the Treasury under the BSA and codified at 31 C.F.R. chapter X, and requirements of 31 U.S.C. § 5318(l) and the implementing regulation jointly promulgated by the Commission and the Department of the Treasury at 31 C.F.R. § 1026.220 (2021), which require that a CIP be adopted as part of the FCM's BSA compliance program.

24.    FCMs are required to implement effective KYC procedures to verify the identity of any person seeking to open an account, maintain records to verify a person's identity, and consult lists of known or suspected terrorists or terrorist organizations (such as those created and distributed by the Office of Foreign Asset Control of the United States Department of Treasury ("OFAC")) to determine whether a person seeking to open an account appears on any such list. *See* 17 C.F.R. § 42.2 and 31 U.S.C. § 5318(l).

25.    Regulation 42.2 specifically mandates compliance with 31 C.F.R. chapter X, which requires that every FCM must:  (1) implement a written CIP that, at a minimum, includes procedures for verifying the identify of each customer sufficient to enable the FCM to form a reasonable belief that it knows the true identify of each customer; (2) retain records collected pursuant to the CIP; and (3) implement procedures for determining whether a customer appears on any list of known or suspected terrorists or terrorist organizations.

26.    Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1), 17 C.F.R. § 180.1(a)(1) (2021), make it unlawful for any person, directly or indirectly, in connection with any contract of sale of any commodity in interstate commerce to intentionally or recklessly use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud.

27.    Section 6(c)(3) of the Act, 7 U.S.C. § 9(3), and Regulation 180.2, 17 C.F.R. § 180.2 (2021), make it "unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price . . . of any commodity in interstate commerce . . . ."

28.     Finally, Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce."

## V.     FACTS

### A.     The Digitex Futures Exchange and Products

29.     During the Exchange Period, Todd operated Digitex Futures from Miami, Florida. For substantial portions of the Relevant Period, Todd exercised strategic control of all business decisions from Digitex Futures' Miami office.  In addition, throughout the Relevant Period, Digitex Futures conducted major portions of its business from its Miami office, including marketing of the Exchange by Todd and Digitex Futures' chief marketing officer, and "launching" the Exchange on July 31, 2020—an event that included a YouTube "livestream" broadcast from Florida and interviews of Todd with United States-based "influencers."

30.     Digitex Futures offered to enter into or execute, and accepted funds to margin, transactions in off-exchange leveraged digital asset futures to customers in the U.S. and throughout the world.  Digitex Futures made the Exchange accessible on its website, available variously at the U.S.-hosted URLs www.digitexfutures.com and www.digitex.io, and through the Digitex Futures mobile application, until the Exchange was removed from the website in May 2022.

31.     Todd published his "white paper" on the internet on December 5, 2017.  The "white paper" is titled "DIGITEX—A commission-free, trustless futures exchange for trading digital currency prices . . . v.1.1," and theorizes about a platform with commission-free trading in which all profits, losses, margin requirements, and account balances on the Exchange would be denominated in its "native currency," DGTX.  In lieu of transaction fees for digital asset futures trading, Digitex Futures was to earn revenue by selling DGTX to the Exchange's market participants, commencing in January 2018.  Out of the contemplated supply of 1 billion DGTX tokens, at least 300 million would be retained by Todd and Digitex Futures.

32.    Beginning January 15, 2018, customers could obtain DGTX tokens directly from Digitex Futures at the digitexfutures.com or digitex.io websites, or in the secondary market by trading at third-party digital asset exchanges.  Todd publicly represented in 2018 that the Digitex Futures' initial DGTX token sales raised $5.2 million in 17 minutes.

33.    Todd's business plan called for periodic sales of tranches of DGTX to the public after the launch of the Exchange to generate revenue for Digitex Futures.  Sales of DTGX were the sole source revenue for Digitex Futures, consistent with Todd's "white paper."  Beginning in 2019, the Digitex Futures "treasury" sold DGTX tokens to customers at a 5% mark-up over the DGTX price, as published by CoinMarketCap, a third-party aggregator of digital asset-related information.

34.    Traders were required to hold DGTX to participate on the Exchange, where DGTX served multiple specific purposes.  For example, traders were required to maintain margin balances denominated in DGTX, minimum "tick sizes" on the Exchange equaled the value of one DGTX token, and traders' profit-and-loss was denominated in terms of DGTX.

35.    DGTX tokens did not confer any ownership rights in the Exchange and did not permit the token holder to participate in any matters concerning the corporate governance of Digitex Futures.

36.    According to Todd's "white paper," Digitex Futures intended to offer DGTX futures contracts to Exchange users so users could hedge any price risk associated with their DGTX tokens.  These DGTX futures contracts, called a "peg system," would "allow[ ] anyone who owns DGTX tokens to lock in a sale price at the current market price, whilst keeping physical possession of their DGTX tokens . . . ."

37.     DGTX was a digital asset, a digital representation of value that functioned as a medium of exchange, and also traded on web-based trading platforms that were accessible to market participants in the United States, including Todd, and therefore was a commodity in interstate commerce.

38.     During the Exchange Period, Digitex Futures allowed customers to trade at least two futures contracts:  bitcoin/USD and ether/USD.  Transactions in these futures contracts that were entered into on the Exchange did not occur on a DCM or FBOT; instead, Digitex Futures purported to operate its own unregulated trading platform.

39.     Digitex Futures' "white paper" provided the standardized contract specifications for its futures contracts, which were fungible contracts that featured a 24-hour duration with an automatic "roll" of any open positions into a new contract at the end of the trading day.  A transaction in the Exchange's futures contracts did not result in a transaction in the underlying digital asset or delivery of the underlying digital asset, and Digitex Futures customers were required to exit a position in the futures contracts through an offsetting transaction on the Exchange.

40.     For each contract listed on the Exchange, the customer interface displayed the relevant contract's price, transaction volume over the most recent 24 hours, a 7-day price chart, and the unexecuted orders to buy and sell at various prices that made up the Exchange's central limit order books, sometimes called price "ladders."  The Exchange's customer interface also displayed mechanisms by which customers could submit orders, including a button that said "trade."

41.     The Exchange allowed customers to place buy and sell orders in an electronic order book and matched customer orders in what it called its "trading engine."

42.     The Exchange allowed customers to exchange bitcoin or ether for DGTX, and customers could use DGTX to margin, guarantee, or secure futures transactions on Digitex Futures.

43.     Digitex Futures acted as the counterparty to transactions on its platform due to its trading as a "market-maker" in various products.

### *Acceptance and/or Control of Customer Funds*

44.     Digitex Futures deployed a smart contract to accept customer funds in the form of DGTX as margin and controlled the circumstances under which a customer's collateral was subject to a margin call.

### B.     Todd Controlled Digitex Futures and Operated Digitex Futures as a Common Enterprise

45.     At all relevant times, Todd has been the majority shareholder or owner of each of the various corporate entities that comprise Digitex Futures and has exercised general control over the Exchange's operations.

46.     Since January 2018, Todd has controlled virtually all material aspects of the Digitex Futures business, including strategic decisions, business development, and marketing of Digitex Futures.  For example, Todd has:

    a.  been responsible for building and overseeing the Exchange's trading engine;

    b.  determined the contract specifications of Digitex Futures' financial products;

    c.  overseen the development of and deployment of the Digitex Futures' internal market maker trading algorithms, which engaged in proprietary trading on the Exchange;

    d.  signed contracts for Digitex Futures;

    e.  controlled Digitex Futures' bank and trading accounts; and

    f.  hired, fired, and determined the compensation of Digitex Futures employees.

47.     Digitex Futures operated as a common enterprise at all relevant times.  Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited were interrelated companies that shared common ownership and management through Todd, as well as common employees, software development resources, email domains, office space, and marketing efforts.

48.     Blockster Holdings Limited holds the U.S. trademark on the word "Digitex" and the trademark application described Digitex's Goods and Services as including the following items:

     a.   "Cryptocurrency exchange services;"

     b.   "Cryptocurrency trading services;"

     c.   "Futures brokerage;"

     d.   "Futures exchange services;"

     e.   "Agencies for commodity futures trading;"

     f.   "Brokerage houses in the fields of stocks, commodities and futures;"

     g.   "Financial brokerage services for cryptocurrency trading;"

     h.   "Financial services, namely, dealing in securities as a market maker and trading commodities, options, futures, equities and fixed income products in the United States and overseas market securities;" and

     i.   "Financial services, namely, proprietary trading in commodities, securities, options, futures, equities and fixed income products in the United States and overseas market securities."

**C.     Digitex Futures Failed To Implement an Effective Anti-Money Laundering Program, KYC Procedures, or a Customer Information Program**

49.     KYC procedures and CIPs collect verifiable customer identifying information such as a copy of a government-issued ID or beneficial ownership information that allows a financial services firm like an FCM to know who its customers are and where they are located.

50.     During the Exchange Period, Digitex Futures failed to implement an AML program and did not implement any KYC procedures or a CIP that would have enabled it to identify U.S. persons on the platform—or the true identity of its customers, whether from the U.S. or elsewhere.

51.     In March 2020, Digitex Futures posted a YouTube video of Todd conceptually disparaging anti-money laundering programs (in particular, KYC procedures) and stating his refusal to comply with them:

> We do not need to do KYC.  People are not laundering ethereum into Digitex to fund international terrorism.  It's [expletive] ridiculous to say that. I'm calling out the charade, for the crock of [expletive] that it is. We are not doing KYC on anybody for any reason. . . .  We don't have the right to ask you for those documents, you should not have to give them in order to use my product. You should not have to give them because the U.S. government or whatever other [expletive] government in the world says that you need to. You do not need to. You just do not.

52.     Digitex Futures allowed customers to open accounts with only an anonymous email and password, and did not require that customers provide any additional identity-verifying documentation.

53.     As Digitex Futures' CEO and principal owner, Todd had control over whether or not Digitex Futures would implement an effective AML program, a CIP, or KYC procedures.

## D.     Todd's and Digitex Futures' Attempted Manipulation of the Price of DGTX Tokens

54.     During the Attempted Manipulation Period, Todd attempted to artificially increase the price of DGTX tokens.  As founder and control person of Digitex Futures (and by extension, the individual who controlled the issuance and primary sales of the Exchange's "native currency" DGTX), Todd had inside information concerning the supply of DGTX and ability to impact the price of DGTX.

55.     Todd's attempted manipulation generally consisted of trying to drive up, or "pumping," the price of DGTX by touting DGTX and the Exchange to increase demand for DGTX

and engaging in non-economic trading activity on third-party exchanges to benefit Defendants' accumulated positions in DGTX.  Digitex Futures required customers to own DGTX to trade on the platform.

56.     The price of DGTX rose sharply during the Attempted Manipulation Period, consistent with Todd's communications, as reflected below in the price chart based on data maintained by CoinMarketCap.  This chart shows the price of DGTX between May 1, 2020 and September 15, 2020; the y-axis is denominated in U.S. dollars.



57.     Todd's scheme to pump the price of DGTX included buying DGTX on third-party exchanges—notwithstanding Todd's and Digitex Futures' ownership of hundreds of millions of DGTX tokens.  Todd's trading activity on third-party exchanges was intended to increase the market price that was reflected on those exchanges, which in turn was incorporated into the price of DGTX as reported by CoinMarketCap.  Because Digitex Futures priced its direct sales of DGTX based on CoinMarketCap's reported price, Todd's plan was therefore intended to increase the price at which Digitex Futures could sell DGTX out of its "treasury."

58.     Todd's plan was exemplified by communications and transactions between Todd and a Digitex Futures' customer ("Customer A"), who is a U.S. citizen that resided in Illinois

during the Attempted Manipulation Period.  In late June 2020, Todd and Customer A began discussing Todd's plan to manipulate the price of DGTX to its all-time high price just ahead of the launch of the Digitex Futures Exchange on July 31, 2020.  Todd explained his intention to influence the price of DGTX to customer A on June 24, 2020, when DGTX was trading at a price of 3.5 cents per token:

> Big exchange listing confirmed for July 3rd so it's gonna pop then. July 10th we'll announce the big public launch and livestream trading event for end of July with $300k of prizes and giveaways on the day and I'll have a bunch of big influencers and trading view traders coming in as guests and talking about how they trade on [Digitex Futures].  Price will break ATH[1] by this launch I think and then shortly after that we'll drop the Digitex City whitepaper which will be very bullish and then we'll launch the Digitex Spot market and then we'll announce our first big $50m IEO/STO which is Blockster. DGTX price going to go crazy in July dude, hang on . . .

59.    And on July 8, 2020, Todd predicted to Customer A:  "DGTX will pop on July 17th."

60.    Throughout July 2020, Todd promoted the July 31, 2020 Exchange launch on social media platforms and the Digitex Futures blog and enlisted others to help him generate interest in DGTX and the Exchange.  Todd told U.S. Customer A that "[a] big crypto youtuber is announcing the launch date on July 17th and he will talk about Digitex on his show for 6 minutes saying that we're back from the dead and the exchange is great and there's loads of users and he's trading on there and he loves it and DGTX is going to blow up."

61.    By July 16, Todd reported to Customer A:  "Things are heating up.  DGTX at 52 week high."

62.    Digitex Futures also marketed DGTX's increasing prices to the public.  On July 20, 2020, Digitex Futures tweeted:  "Growing demand has pushed the price up by nearly 167%

---

[1] ATH is slang for "all time high" in the digital asset space.

throughout July.  Despite the massive gains already posted, different on-chain metrics suggest #DGTX is poised for higher highs."  At this time, Digitex Futures did not publicize the fact that its owner, Todd, was engaged in non-economic trading activity on third-party exchanges for the purpose of "pumping" the price of DGTX.

63.     While soliciting money from Customer A on July 23, 2020, Todd described his intent to push up the DGTX token price:  "I want to do a big pump this week to break our ATH leading up to the launch day and get the FOMO[2] going crazy so if you can get me that $300k by tomorrow . . . .  I'll spend the lot on buying DGTX over the weekend 🀄 🎲 [.]"  Customer A wired $300,000 to Todd's personal bank account on July 23, 2020.

64.     Between July 23, 2020 and the July 31, 2020 Exchange "public launch," both Todd and Customer A continued to enter bids (buy orders) on a third-party exchange to purchase DGTX, putting upward pressure on the price.  For example, on July 24, 2020, Todd reported to Customer A that as a result of his relentless DGTX buying, to which Todd represented he committed "$100k in last 12 hours," Todd finally "broke" a 10.2-cent price barrier set by sellers in the DGTX market.

65.     On July 25, 2020, Customer A told Todd he "bought about $50k."  Todd responded that he bought "$150 DGTX" and reported that the price "just popped to 11 [cents].  There were some aggressive sellers but looks like they ran out of tokens."  Customer A subsequently told Todd that he bought another 1 million DGTX tokens and "Got [the DGTX token price] back up to 11 cents."

66.     On July 29, 2020, two days before the Exchange "public launch," Todd described the mechanics of his plan to Customer A to manipulate the price of DGTX through non-economic trading:

---

[2] FOMO is slang for "fear of missing out" in the digital asset space.

> I'm setting up OTC sales desk to get big fiat buy orders coming in which I will then
> fill by aggressively buying on [another exchange] . . . That will be the key to the
> big move I think. . . . I'll be losing money on the otc trades but should get [the price
> of DGTX] pumping.

In other words, Todd hoped to receive large orders for DGTX directly from market participants

(as opposed to through orders placed on the Exchange), and then take the money he received from

those prospective purchasers and use it to buy DGTX on third-party digital asset trading platforms

(as opposed to simply filling the order out of the Digitex Futures "treasury," which held hundreds

of millions of DGTX tokens with a cost basis to Digitex Futures of zero).  This transaction

pattern—realize trading losses while filling off-exchange orders (also called over-the-counter or

"OTC" orders) on third-party platforms to pump the price of DGTX—is exactly what Todd stated

he would do with Customer A's $300,000 cash transfer, described above, on July 23.

67.     Customer A asked why Todd anticipated losing money on the over-the-counter

trades—that is, Customer A asked Todd why Todd would engage in non-economic trading.  Todd

replied that he hoped to benefit from his pumping activity due to the impact the increased price of

DGTX would have on the value of the holdings of the Digitex Futures "treasury":

> I'll sell big block of dgtx [in an OTC transaction] and then I will take that money
> and buy DGTX with it on [another exchange] at higher prices than I just sold for to
> pump it up some more.  Rinse and repeat, every big otc buy order I'll send straight
> into [another exchange]. . . . But with a higher price I make more from the Digitex
> Treasury sales on the website. . . . . Treasury sells at 5% premium on cmc price you
> can see the price on the Buy DGTX page of the website. . . . So it doesn't exert any
> downward pressure on the price because only people who don't want to deal with
> a crypto exchange buy from the treasury.

68.     On July 31, 2020, Todd hosted a 5-hour live YouTube launch during which he

continued to tout the DGTX price, stating "the token price was at 4 cents at the start of July and it

went to 12 cents."  During the livestream, Todd did not disclose his own non-economic trading

activity and instead predicted the DGTX price would reach $1 per token by the end of 2020 while

downplaying the risks of trading on the Exchange and price volatility of DGTX:

> So, yes, you do have to hold the Digitex token in order to benefit from very liquid
> markets with no cost at all, but holding the Digitex token is actually a good thing.
> You can make money from trading on the exchange and during that time your
> tokens are also becoming more valuable.
>
> So, you know, it's actually a double whammy while we're moving up, and for the
> foreseeable future, we're going to be moving up because we've got crazy, crazy
> plans to create just ridiculous demand for the Digitex token.

69.     Todd assured an "influencer" interviewing him during the Exchange launch that the

liquidity on the Exchange "is not being provided by me or the exchange.  [T]his liquidity is coming

from other traders that are trading just like I am doing now."

70.     Later in the live launch, another "influencer" asked Todd about the approximate

200% increase in the token price in the weeks leading up to the launch.  Todd responded:  "Right,

and we sold millions of tokens during that time. . . . You would think that selling tokens means the

price goes down.  It really doesn't."  Todd did not disclose to this "influencer" that he was engaging

in non-economic trading activity in DGTX on third-party exchanges with the intent to "pump" the

price of DGTX.

71.     Todd continued his efforts to solicit or retain funds from Customer A after the

Exchange's "public launch" by disclosing his plan to pump the price of DGTX through activity on

other exchanges.  For example, the day after the Exchange launched, Todd told Customer A that

he planned to put $100,000 into his "pump machine bot," which Todd explained was an

algorithmic trading strategy he deployed on other exchanges to drive up the price of DGTX.

72.     Thereafter, on August 4, 2020, Todd told Customer A that he held accounts on

third-party digital asset exchanges with as much as 11.5 million DGTX for the purpose of creating

"relentless pressure that isn't noticed as much because I do it through my market making bot that is always buying more than it is selling" to pump up the market price of DGTX.

73.     Todd resided in Florida during the Attempted Manipulation Period and therefore engaged in the "pumping" activity described above from the United States.

74.     According to Todd, 1,500 customers deposited at least $1.5 million worth of DGTX into the Exchange in the seven days prior to August 4, 2020.

75.     According to documents provided by Todd to Customer A, during the first two months after the Exchange's "public launch" on July 31, 2020, at least 13,920 customers deposited $2,412,220 worth of DGTX into accounts at the Exchange.

76.     Through at least June 23, 2022, Digitex Futures continued to tout, mint, and sell DGTX tokens from the Digitex "treasury."

## VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT I
### AGAINST ALL DEFENDANTS

**Violations of Section 6(c)(3) and 9(a)(2) of the Act, 7 U.S.C. §§ 9(3), 13(a)(2), and Regulation 180.2, 17 C.F.R. § 180.2 (2021)**

**Attempted Manipulation of the Price DGTX**

77.     Paragraphs 1 through 48 and 54 through 76 of this Complaint are re-alleged and incorporated herein by reference.

78.     During the Relevant Period, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation, and Todd, all acting as a common enterprise and doing business as Digitex Futures, and their officers, employees, and agents, violated 7 U.S.C. §§ 9(3) and 13(a)(2) and 17 C.F.R. § 180.2 by, directly or indirectly, attempting to manipulate the price of "native currency" DGTX,a commodity in interstate commerce.

79.     Defendants, directly or indirectly, in connection with a contract of a commodity in interstate commerce, intentionally attempted to manipulate the price of a commodity in interstate commerce.

80.     Defendants specifically intended to create or affect a price or price trend that did not reflect legitimate forces of supply and demand.

81.      Defendants took overt actions in furtherance of an attempt to manipulate the price of a commodity in interstate commerce.

82.     The acts and omissions of Todd and other officers, employees, or agents acting for Digitex Futures described in this Complaint were done within the scope of their office, employment, or agency with Digitex Futures.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Digitex Futures is liable as a principal for each act, omission, or failure of the other officers, employees, or agents acting for Digitex Futures, constituting violations of 7 U.S.C. § 9(3) and 17 C.F.R. § 180.2.

83.     Each and every overt action in furtherance of the attempt to manipulate prices, and each act of attempted manipulation is alleged herein as a separate and distinct violation of 7 U.S.C. §§ 9(3) and 13(a)(2) and 17 C.F.R. § 180.2.

**COUNT II**
**AGAINST ALL DEFENDANTS**

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and**
**Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2021)**

**Fraud and Manipulation by Deceptive Device or Contrivance**

84.     Paragraphs 1 through 48 and 54 through 76 of this Complaint are re-alleged and incorporated herein by reference.

85.     During the Relevant Period, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, Blockster Holdings Limited Corporation, and Todd, all acting as a common enterprise and doing business as Digitex Futures, and their officers, employees, and agents, violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) by, directly or indirectly, using a manipulative or deceptive device or contrivance in connection with the sale of "native currency" DGTX, a commodity, in an attempt to manipulate the price of a commodity in interstate commerce.

86.     Defendants, directly or indirectly, in connection with a contract of a commodity in interstate commerce, recklessly attempted to manipulate the price of a commodity in interstate commerce.

87.     Defendants took actions that were an extreme departure from the standard of ordinary care and should have known their actions could create or affect a price or price trend that did not reflect legitimate forces of supply and demand.

88.     Defendants took overt actions in furtherance of an attempt to manipulate the price of a commodity in interstate commerce.

89.     The acts and omissions of Todd and other officers, employees, or agents acting for Digitex Futures described in this Complaint were done within the scope of their office, employment, or agency with Digitex Futures.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Digitex Futures is liable as a principal for each act, omission, or failure of the other officers, employees, or agents acting for Digitex Futures, constituting violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

90.     Each and every overt action in furtherance of the attempt to manipulate prices, and each act of attempted manipulation is alleged herein as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

## COUNT III
## AGAINST ALL DEFENDANTS

**Violations of Section 4(a) of the Act, 7 U.S.C. § 6(a), or, alternatively, Section 4(b) of the Act, 7 U.S.C. § 6(b) and Regulation 48.3, 17 C.F.R. § 48.3 (2021)**

**Execution of Futures Transactions on an Unregistered Board of Trade**

91.     The allegations set forth in paragraphs 1 through 48 are re-alleged and incorporated herein by reference.

92.     Since at least July 31, 2020, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, Blockster Holdings Limited Corporation, all acting as a common enterprise and doing business as Digitex Futures, and through Todd and their officers, employees, and agents, violated 7 U.S.C. § 6(a) by:

a.  confirming the execution of contracts for the purchase or sale of digital assets for future delivery; and

b.  conducting an office or business in the U.S. for the purpose of soliciting, or accepting any order for, or otherwise dealing in, any transaction in, or in connection with contracts for the purchase or sale of digital assets for future delivery—

without conducting its futures transactions on or subject to the rules of a board of trade that was designated or registered by the CFTC as a contract market.

93.     In the alternative, since at least July 31, 2020, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, Blockster Holdings Limited Corporation, and Adam Todd, all acting as a common enterprise and doing business as Digitex Futures, and through their officers, employees, and agents, violated 7 U.S.C. § 6(b) and Commission Regulation 48.3, 17 C.F.R. § 48.3 (2021), by permitting direct access to its electronic trading and order matching system without obtaining an Order of Registration for a foreign board of trade from the Commission.

94.     Each offer to enter into, execution of, and/or confirmation of the execution of illegal off-exchange futures transactions, including, without limitation, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6(a) or, alternatively, 7 U.S.C. § 6(b) and 17 C.F.R. §48.3.

95.     During the Relevant Period, Todd directly or indirectly controlled Digitex Futures, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Digitex Futures' violations described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Todd is therefore liable for Digitex Futures' violations described in this Count to the same extent as Digitex Futures.

### COUNT IV
### AGAINST ALL DEFENDANTS

**Violation of Section 4d of the Act, 7 U.S.C. § 6d**
**Failure to Register as a Futures Commission Merchant**

96.     Paragraphs 1 through 48 of this Complaint are re-alleged and incorporated herein by reference.

97.     Since July 31, 2020, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation, and through Todd and their officers, employees, and agents, operated as an FCM by:

a.  engaging in soliciting or accepting orders for the purchase or sale commodities for future delivery;

b.  and, in or in connection with these activities, accepting money, securities, or property (or extending credit in lieu thereof) to margin, guarantee, or secure resulting trades on the Exchange.

98.     Since July 31, 2020, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation, all acting as a common enterprise and doing business as Digitex Futures, and through Todd and their officers, employees, and agents, violated 7 U.S.C. § 6d by failing to register with the Commission as a Futures Commission Merchant.

99.     Each act in violation of 7 U.S.C. § 6d, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

100.    Todd directly or indirectly controlled Digitex Futures and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Digitex Futures' violations of 7 U.S.C. § 6d.  Therefore, pursuant to 7 U.S.C. § 13c(b), Todd is liable as a control person for each of Digitex Futures' violations of 7 U.S.C. § 6d.

**COUNT V**
**AGAINST ALL DEFENDANTS**

**Violations of Regulation 42.2, 17 C.F.R. § 42.2 (2021)**

**Failure to Implement Customer Information Program, and Failure to Implement Know Your Customer and Anti-Money Laundering Procedures**

101.    Paragraphs 1 through 53 of this Complaint are re-alleged and incorporated herein by reference.

102.    As alleged in paragraphs 96 through 100, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation, all acting as a common enterprise and doing business as Digitex Futures, operated as an FCM.  FCMs are required comply with 17 C.F.R. § 42.2.

103.    Since July 31, 2020, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation, all acting as a common enterprise and doing business as Digitex Futures, and through their officers, employees, and agents, violated and are continuing to violate 17 C.F.R. § 42.2 by failing to implement a Customer Information Program,

failing to implement KYC policies and procedures, failing to implement an Anti-Money Laundering program, failing to retain required customer information, and failing to implement procedures to determine whether a customer appears on lists of known or suspected terrorists or terrorist organizations such as those issued by OFAC.

104.    Each act in violation of 17 C.F.R. § 42.2, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

105.    Todd directly or indirectly controlled Digitex Futures and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Digitex Futures' violations of 17 C.F.R. § 42.2.  Therefore, pursuant to 7 U.S.C. § 13c(b), Todd is liable as a control person for each of Digitex Futures' violations of 17 C.F.R. § 42.2.

## VII.    RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-l, and pursuant to the Court's own equitable powers, enter:

A.    An order finding that Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited, collectively doing business as Digitex Futures, and through their officers, employees, and agents, including without limitation Todd, violated Section 4(a) of the Act, 7 U.S.C. § 6(a) or, in the alternative, Section 4(b) of the Act, 7 U.S.C. § 6(b) and Regulation 48.3, 17 C.F.R. § 48.3 (2021); Section 4d of the Act, 7 U.S.C. § 6d; Sections 6(c)(1), 6(c)(3) and 9(a)(2) of the Act, 7 U.S.C. §§ 9(1), 9(3), and 13(a)(2); and Regulations 42.2, 180.1(a), and 180.2, 17 C.F.R. §§ 42.2, 180.1(a), and 180.2 (2021).

B.    An order of permanent injunction prohibiting Defendants and any other person or entity associated with them, from engaging in conduct described above, in violation of 7 U.S.C. §§ 6(a) (or, in the alternative, 7 U.S.C. § 6(b) and 17 C.F.R. § 48.3), 6d, 9(1), 9(3), and 13(a)(2),

and 17 C.F.R. §§ 42.2, 180.1(a) and 180.2.

C.     An order of permanent injunction prohibiting Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active concert or participation with Defendants, from directly or indirectly:

(i)     trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a(40));

(ii)    entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2021)) or digital assets that are commodities (as that term is described in this complaint), for Defendants' own accounts or for any account in which they have a direct or indirect interest;

(iii)   having any commodity interests or digital assets that are commodities (as that term is described in this complaint) traded on Defendants' behalf;

(iv)   controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital assets that are commodities (as that term is described in this complaint);

(v)    soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests or digital assets that are commodities (as that term is described in this complaint);

(vi)   applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as

provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021);

(vii)    acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9);

D.    An order directing Defendants and any third-party transferee and/or successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, loans, or fees derived, directly or indirectly, from acts or practices which constitute violations of the Act as described herein, including pre-judgment and post-judgment interest;

E.    An order directing Defendants and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between or with Defendants and any customer or investor whose funds were received by Defendants a result of the acts and practices that constituted violations of the Act, as described herein;

F.    An order requiring Defendants to make full restitution by making whole each and every customer or investor whose funds were received or utilized by them in violation of the provisions of the Act as described herein, including pre-judgment interest;

G.    An order directing Defendants to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each violation of the Act, as

described herein;

      H.    An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C.

§§ 1920 and 2412(a)(2); and

      I.    Such other and further relief as the Court deems proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated:  September 30, 2022

Respectfully submitted,

Commodity Futures Trading Commission

By its attorneys:

*/s/ Ansley H. Schrimpf*

Ansley H. Schrimpf
Trial Attorney
Special Bar # A5502922
*aschrimpf@cftc.gov*
312-596-0574 (direct)

Joseph C. Platt
Trial Attorney
Special Bar #A5502676
*jplatt@cftc.gov*

Allison V. Passman
Chief Trial Attorney
Special Bar #A5502489
*apassman@cftc.gov*

Scott R. Williamson
Deputy Regional Counsel
*swilliamson@cftc.gov*

Commodity Futures Trading Commission
77 West Jackson Blvd., Suite 800
Chicago, Illinois 60604
(312) 596-0700
(312) 596-0714 (fax)

*Attorneys for Plaintiff*
*Commodity Futures Trading Commission*