## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> ADAM TODD, DIGITEX LLC, DIGITEX LIMITED, DIGITEX SOFTWARE LIMITED, AND BLOCKSTER HOLDINGS LIMITED CORPORATION (D/B/A DIGITEX FUTURES) <br><br> Defendants. | CIVIL ACTION NO: 1:22-cv-23174-RKA <br><br> Hon. Roy K. Altman |

## PLAINTIFF'S MOTION FOR FINAL JUDGMENT BY DEFAULT, PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES, AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST ALL DEFENDANTS

Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC"), submits this motion ("Motion") pursuant to Rule 55(b) of the Federal Rules of Civil Procedure for entry of default judgments against Defendants Adam Todd, Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation ("Defendants" unless referred to individually).[1]   The Commission supports the Motion, as appropriate, with a declaration of compliance with the Service Members Civil Relief Act as Exhibit 1 of this filing, and evidence provided in the Declaration of Joseph Patrick as Exhibit 2 of this filing.

---

[1] In response to the Court's Order on Default Final Judgment Procedure, (ECF No. 30), the CFTC states that no Defendant in this action has answered the operative pleading or otherwise attempted to defend the CFTC's claims and the Clerk entered default against all Defendants pursuant to Rule 55(a). Accordingly, the CFTC believes there is no risk of inconsistent judgments if the Court grants this motion and enters the contemporaneously filed [Proposed] Order for Judgment By Default against all Defendants.

## I.     INTRODUCTION

The clerk has entered default under Rule 55(a) as to all Defendants.  (ECF No. 29.) Pursuant to Rule 55(b), based on the allegations in the Amended Complaint against Defendants, which the Court should take as true, and on the evidence concerning equitable and legal remedies, the CFTC requests that the Court grant the Motion and enter the concurrently-filed Proposed Order for Judgment by Default against Defendants.

## II.     RELEVANT PROCEDURAL HISTORY

The CFTC filed its Complaint on September 30, 2022, (ECF No. 1), and amended it solely to add allegations concerning service of process on December 28, 2022, (Am. Compl., ECF No. 13).  Neither Defendants nor the attorney who had represented Defendants during the CFTC's pre-suit investigation substantively responded to the CFTC's requests to waive service. (*See* ECF No. 18-1 (A. Schrimpf Aff. ¶¶ 14–15).)

Claims against the Defendants remain unresolved.  All Defendants have been properly served with process but have not appeared, have not answered the CFTC's Complaint or Amended Complaint, and have not otherwise attempted to defend the CFTC's claims.  (*See* ECF No. 18-1).

## III.     LEGAL STANDARD

A district court clerk shall enter a party's default if a party fails to plead or otherwise defend an action brought against it. Fed. R. Civ. P. 55(a). After a party's default has been entered by the clerk, the party that sought the default may file a motion requesting a default judgment. Fed. R. Civ. P. 55(b)(2); *CFTC v. FX Professional Intern. Solutions, Inc.*, No. 1:10-CV-22311-PCH, 2010 WL 5541050, at *4 (S.D. Fla. Nov. 29, 2010).  The decision to grant a motion for default judgment is within the sound discretion of the district court. *Wahl v. McIver*, 773 F.2d 1169, 1174 (11th Cir.

1985) (district courts have "the authority to enter default judgment for failure to . . . comply with . . . rules of procedure").

Upon the court's determination that a defendant is in default, well-pleaded factual allegations of the complaint will be deemed admitted and liability established. *See* Fed. R. Civ. P. 8(d) ("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading."); *see also Perez v. Wells Fargo, N.A.*, 774 F.3d 1329, 1339 (11th Cir. 2014) ("a defaulted defendant is deemed to have admitted the movant's well-pleaded allegations of facts"); *CFTC v. Mercury Partners, Inc.*, No. 05-60328, 2005 WL 8157537 (S.D. Fla. Nov. 10, 2005) (granting motion for default judgment and entering findings of fact and conclusions of law finding defendant liable as to all violations alleged in complaint).

"Although a defaulted defendant admits well-pleaded allegations of liability, allegations relating to the amount of damages are not admitted by virtue of default. Rather, the Court determines the amount and character of damages to be awarded." *Robbie's of Key W. v. M/V Komedy III*, 470 F. Supp. 3d 1264, 1268 (S.D. Fla. 2020). A court may hold a hearing to determine an appropriate amount of monetary relief to impose in connection with a default judgment, but need not do so if no defendant objects and the proposed relief can be "computed to be made certain." *CFTC v. Amerman*, 645 F. App'x 938, 943–44 (11th Cir. 2016) (citing *SEC v. Smyth*, 420 F.3d 1225, 1231 (11th Cir. 2005)). It is not necessary to hold a hearing when entering a final default judgment "if the damages are liquidated or ascertainable from documentary evidence or affidavits." *Shandong Airlines Co., Ltd. v. Capt. LLC*, 650 F. Supp. 2d 1202, 1207 (M.D. Fla. 2009).

## IV.   FACTS

### A.  Parties to the Motion for Default Judgment

Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the CEA and Regulations promulgated thereunder. (*See* ECF No. 13 (Am. Compl. ¶ 12).)

Defendants **Digitex Limited**, **Digitex Software Limited**, **Blockster Holdings Limited**, and **Digitex LLC** are a common enterprise of corporate entities that comprise Digitex Futures, as defined below, which operated Digitex Futures Exchange from an office in Miami, Florida. This Motion refers collectively to the entity Defendants listed in the preceding sentence as "Digitex Futures" and the web-based exchange as the "Exchange." None of the entities comprising Digitex Futures has ever been registered with the Commission in any capacity. Digitex Limited was registered in the Republic of Seychelles on December 11, 2017. Digitex Software Limited was registered in Ireland on March 8, 2018, and operated in Dublin with a small staff of software developers for several months. At all times relevant to the Amended Complaint, Todd owned Digitex Limited and Digitex Software Limited. Since at least January 27, 2021, Todd has co-owned Blockster Holdings Limited, a Gibraltar entity. On April 27, 2021, Todd and Blockster Holdings Limited applied to form Digitex LLC in St. Vincent & the Grenadines. (*Id.* ¶ 13).)

Defendant **Adam Todd** is a natural person who resided in Miami, Florida during much of the Relevant Period, as defined below. Todd founded and was the CEO of Digitex Futures. Todd owned and controlled all of the entities comprising Digitex Futures at all times relevant to the Amended Complaint. Todd has never been registered with the Commission in any capacity. (*Id.* ¶ 14.)

**B. The Digitex Futures Exchange and Products**

Between December 2017 and the filing of the Complaint, (the "Relevant Period"), Todd owned, built, and operated Digitex Futures as an illegal digital asset derivatives trading platform. As set forth in greater detail below, Defendants operated their illegal digital asset derivatives exchange, as set forth in detail below, between July 31, 2020 and at least May 2022 (the "Exchange Period"), and engaged in attempted manipulation of the DGTX token, as set forth in detail below, between approximately May 1, 2020 and August 15, 2020 (the "Attempted Manipulation Period").

For substantial portions of the Relevant Period, Todd exercised strategic control of all business decisions from Digitex Futures' Miami office. Digitex Futures offered to enter into or execute, and accepted funds to margin, transactions in off-exchange leveraged digital asset futures to customers in the U.S. and throughout the world. (*Id.* ¶ 30.) DGTX was a digital asset, a digital representation of value that functioned as a medium of exchange, and also traded on web-based trading platforms that were accessible to market participants in the United States, including Todd, and therefore was a commodity in interstate commerce. (*Id.* ¶ 37.) During the Exchange Period, Digitex Futures allowed customers to trade at least two futures contracts: bitcoin/USD and ether/USD. Transactions in these futures contracts that were entered into on the Exchange did not occur on a DCM or foreign board of trade; instead, Digitex Futures purported to operate its own unregulated trading platform. (*Id.* ¶ 38.)

The Exchange allowed customers to exchange bitcoin or ether for DGTX, and customers could use DGTX to margin, guarantee, or secure futures transactions on Digitex Futures. (*Id.* ¶ 42.) Digitex Futures deployed a smart contract to accept customer funds in the form of DGTX as margin and controlled the circumstances where a customer's collateral was subject to a margin call. (*Id.* ¶ 44.)

### C. Todd Controlled Digitex Futures and Operated Digitex Futures as a Common Enterprise

At all relevant times, Todd has been the majority shareholder or owner of each of the various corporate entities that comprise Digitex Futures and has exercised general control over the Exchange's operations. (*Id.* ¶ 45.) Digitex Futures operated as a common enterprise at all relevant times. (*Id.* ¶ 47.) Since January 2018, Todd has controlled virtually all material aspects of the Digitex Futures business, including strategic decisions, business development, and marketing of Digitex Futures. For example, Todd has:

a. been responsible for building and overseeing the Exchange's trading engine;

b. determined the contract specifications of Digitex Futures' financial products;

c. overseen the development of and deployment of the Digitex Futures' internal market maker trading algorithms, which engaged in proprietary trading on the Exchange;

d. signed contracts for Digitex Futures;

e. controlled Digitex Futures' bank and trading accounts; and

f. hired, fired, and determined the compensation of Digitex Futures employees.

(*Id.* ¶ 46.)

### D. Digitex Futures Failed To Implement an Effective Anti-Money Laundering Program, KYC Procedures, or a Customer Information Program

Know-your-customer ("KYC") procedures and Customer Information Programs ("CIPs") collect verifiable customer identifying information such as a copy of a government-issued ID or beneficial ownership information that allows a financial services firm like an FCM to know who its customers are and where they are located. During the Exchange Period, Digitex Futures failed to implement an AML program and did not implement any KYC procedures or a CIP that would have enabled it to identify U.S. persons on the platform—or the true identity of its customers, whether from the U.S. or elsewhere. (*Id.* ¶¶ 49-50.)

6

In March 2020, Digitex Futures posted a YouTube video of Todd conceptually disparaging anti-money laundering programs (in particular, KYC procedures) and stating his refusal to comply with AML requirements:

> We do not need to do KYC. . . . You should not have to give them because the U.S. government or whatever other [expletive] government in the world says that you need to. You do not need to. You just do not.

(*Id.* ¶ 51.)

Digitex Futures allowed customers to open accounts with only an anonymous email and password, and did not require that customers provide any additional identity-verifying documentation. As Digitex Futures' CEO and principal owner, Todd controlled whether Digitex Futures would implement an effective AML program, a CIP, or KYC procedures. (*Id.* ¶¶ 52-53.)

### E. Todd's and Digitex Futures' Attempted Manipulation of the Price of DGTX Tokens

During the Attempted Manipulation Period, Todd attempted to artificially increase the price of DGTX tokens. As founder and control person of Digitex Futures (and by extension, the individual who controlled the issuance and primary sales of the Exchange's "native currency" DGTX), Todd had inside information concerning the supply of DGTX and ability to impact the price of DGTX. Todd's attempted manipulation generally consisted of trying to drive up, or "pumping," the price of DGTX by touting DGTX and the Exchange to increase demand for DGTX and engaging in non-economic trading activity on third-party exchanges to benefit Defendants' accumulated positions in DGTX. Digitex Futures required customers to own DGTX to trade on the platform. (*Id.* ¶¶ 54-55.)

The price of DGTX rose sharply during the Attempted Manipulation Period, consistent with Todd's communications, as reflected below in the price chart based on data maintained and generated by CoinMarketCap. This chart shows the price of DGTX between May 1, 2020 and September 15, 2020; the y-axis is denominated in U.S. dollars. (*Id.* ¶ 56.)



Todd's scheme to pump the price of DGTX included buying DGTX on third-party exchanges—notwithstanding Todd's and Digitex Futures' ownership of hundreds of millions of DGTX tokens. Todd's trading activity on third-party exchanges was intended to increase the market price that was reflected on those exchanges, which in turn was incorporated into the price of DGTX as reported by CoinMarketCap. Because Digitex Futures priced its direct sales of DGTX based on CoinMarketCap's reported price, Todd's plan was therefore intended to increase the price at which Digitex Futures could sell DGTX out of its "treasury."

Todd's plan was exemplified by communications and transactions between Todd and a Digitex Futures' customer ("Customer A"), who is a U.S. citizen that resided in Illinois during the Attempted Manipulation Period. In late June 2020, Todd and Customer A began discussing Todd's plan to manipulate the price of DGTX to its all-time high price just ahead of the launch of the Digitex Futures Exchange on July 31, 2020. Todd explained his intention to influence the price of DGTX to customer A on June 24, 2020, when DGTX was trading at a price of 3.5 cents per token. (*Id.* ¶ 58.)

On July 8, 2020, Todd predicted to Customer A: "DGTX will pop on July 17th." (*Id.* ¶ 59.) Throughout July 2020, Todd promoted the July 31, 2020 Exchange launch on social media

platforms and the Digitex Futures blog and enlisted others to help him generate interest in DGTX and the Exchange.  By July 16, Todd reported to Customer A: "Things are heating up.  DGTX at 52 week high."  (*Id.* ¶ 61.)

Digitex Futures also marketed DGTX's increasing prices to the public.  On July 20, 2020, Digitex Futures tweeted: "Growing demand has pushed the price up by nearly 167% throughout July.  Despite the massive gains already posted, different on-chain metrics suggest #DGTX is poised for higher highs."  At this time, Digitex Futures did not publicize the fact that its owner, Todd, was engaged in non-economic trading activity on third-party exchanges for the purpose of "pumping" the price of DGTX.  (*Id.* ¶ 62.)  While soliciting money from Customer A on July 23, 2020, Todd described his intent to push up the DGTX token price: "I want to do a big pump this week to break our ATH[2] leading up to the launch day and get the FOMO[3] going crazy so if you can get me that $300k by tomorrow . . . . I'll spend the lot on buying DGTX over the weekend 🔨⚖️[.]"  Customer A wired $300,000 to Todd's personal bank account on July 23, 2020. (*Id.* ¶ 63.)

Between July 23, 2020 and the July 31, 2020 Exchange "public launch," both Todd and Customer A continued to enter bids (buy orders) on a third-party exchange to purchase DGTX, putting upward pressure on the price.  For example, on July 24, 2020, Todd reported to Customer A that as a result of his relentless DGTX buying, to which Todd represented he committed "$100k in last 12 hours," Todd finally "broke" a 10.2-cent price barrier set by sellers in the DGTX market. (*Id.* ¶ 64.)  On July 25, 2020, Customer A told Todd he "bought about $50k."  Todd responded that he bought "$150 DGTX" and reported that the price "just popped to 11 [cents]. ..."(*Id.* ¶ 65.)

---

[2] ATH is slang for "all time high" in the digital asset space.
[3] FOMO is slang for "fear of missing out" in the digital asset space.

9

On July 29, 2020, two days before the Exchange "public launch," Todd described the mechanics of his plan to Customer A to manipulate the price of DGTX through non-economic trading:

> I'm setting up OTC sales desk to get big fiat buy orders coming in which I will then fill by aggressively buying on [another exchange] . . . That will be the key to the big move I think. . . . I'll be losing money on the otc trades but should get [the price of DGTX] pumping.

In other words, Todd hoped to receive large orders for DGTX directly from market participants (as opposed to through orders placed on the Exchange), and then take the money he received from those prospective purchasers and use it to buy DGTX on third-party digital asset trading platforms (as opposed to simply filling the orders out of the Digitex Futures "treasury," which held hundreds of millions of DGTX tokens with a cost basis to Digitex Futures of zero). This transaction pattern—realize trading losses while filling off-exchange orders (also called over-the-counter or "OTC" orders) on third-party platforms to pump the price of DGTX—is exactly what Todd stated he would do with Customer A's $300,000 cash transfer, described above, on July 23. (*Id.* ¶ 66.)

Customer A asked why Todd anticipated losing money on the over-the-counter trades—that is, Customer A asked Todd why Todd would engage in non-economic trading. Todd replied that he hoped to benefit from his pumping activity due to the impact the increased price of DGTX would have on the value of the holdings of the Digitex Futures "treasury":

> I'll sell big block of dgtx [in an OTC transaction] and then I will take that money and buy DGTX with it on [another exchange] at higher prices than I just sold for to pump it up some more. Rinse and repeat, every big otc buy order I'll send straight into [another exchange]. . . . But with a higher price I make more from the Digitex Treasury sales on the website. . . . . Treasury sells at 5% premium on cmc price you can see the price on the Buy DGTX page of the website. . . . So it doesn't exert any downward pressure on the price because only people who don't want to deal with a crypto exchange buy from the treasury.

(*Id.* ¶ 67.)

On July 31, 2020, Todd hosted a 5-hour live YouTube launch from Florida during which he continued to tout the DGTX price, stating "the token price was at 4 cents at the start of July and it went to 12 cents." During the livestream, Todd did not disclose his own non-economic trading activity and instead predicted the DGTX price would reach $1 per token by the end of 2020 while downplaying the risks of trading on the Exchange and price volatility of DGTX. (*Id.* ¶ 68.)

According to Todd, 1,500 customers deposited at least $1.5 million worth of DGTX into the Exchange in the seven days prior to August 4, 2020. (Am. Compl. ¶ 74; *see also* Patrick Decl. ¶ 14) According to documents provided by Todd to Customer A, during the first two months after the Exchange's "public launch" on July 31, 2020, at least 13,920 customers deposited $2,412,220 worth of DGTX into accounts at the Exchange. (Am. Compl. ¶ 75; *see also* Patrick Decl. ¶ 15.) Together together, Todd's representations about customer deposits totaled $3,912,220 in gains he and in ill-gotten gains he and Digitex Futures would not have otherwise received without operating an unregistered futures exchange. (Patrick Decl. ¶¶ 16-17.)

## V.    DISCUSSION

During the Attempted Manipulation Period, Todd attempted to manipulate the price of DGTX by engaging in non-economic trading activity—here, trading that was expected to lose money rather than make money—on third-party digital asset trading platforms with the intent to artificially inflate (or "pump") the price of DGTX to increase the value of the DGTX tokens held by Todd and Digitex Futures and to benefit Digitex Futures by attempting to legitimize its "native currency." Digitex Futures is liable for Todd's attempted manipulation-related violations pursuant to Section 2(a)(1)(B) of the Act because Todd was acting as the Digitex Futures CEO while attempting to manipulate the price of DGTX.

During the Exchange Period, Digitex Futures engaged in regulatory and registration violations through the acts and omissions of its employees and agents, including Todd. *See* 7 U.S.C. § 2(a)(1)(B). Todd is liable as control person for Digitex Futures regulatory and registration violations pursuant to Section 13(b) of the Act because Todd controlled Digitex Futures at all relevant times and did not act in good faith or knowingly induced the conduct comprising Digitex Futures violations. *See* 7 U.S.C. § 13c(b).

Thus, all Defendants are liable for all five counts alleged the Amended Complaint, either directly or through various principles of derivative liability, and should be held jointly and severally liable.

## A.  Count I Against All Defendants: Attempted Manipulation of the Price of DGTX

During the Attempted Manipulation Period, Defendants, through Todd and their agents and employees, violated Sections 6(c)(3) and 9(a)(2) of the Act, 7 U.S.C. §§ 9(3), 13(a)(2), and Regulation 180.2, 17 C.F.R. § 180.2 (2022) by, directly or indirectly, attempting to manipulate the price of "native currency" DGTX, a commodity in interstate commerce. Defendants specifically intended to "pump" or create or affect a price or price trend that did not reflect legitimate forces of supply and demand. Defendants took overt actions in furtherance of an attempt to manipulate the price of a commodity in interstate commerce.

Todd is directly liable for his acts and omissions. The acts and omissions of Todd and other officers, employees, or agents acting for Digitex Futures described in the Amended Complaint were done within the scope of their office, employment, or agency with Digitex Futures. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022), Digitex Futures is liable as a principal for each act, omission, or failure of the other officers, employees, or agents acting for Digitex Futures, constituting violations of 7 U.S.C. § 9(3) and 17 C.F.R. § 180.2. Each and every overt

action in furtherance of the attempt to manipulate prices, and each act of attempted manipulation is a separate and distinct violation of 7 U.S.C. §§ 9(3) and 13(a)(2) and 17 C.F.R. § 180.2.

**B. Count II Against All Defendants: Fraud and Manipulation by Deceptive Device or Contrivance**

During the Attempted Manipulation Period, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, Blockster Holdings Limited Corporation, and Todd, all acting as a common enterprise and doing business as Digitex Futures, and their officers, employees, and agents, violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) (2022), by, directly or indirectly, using a manipulative or deceptive device or contrivance in connection with the sale of "native currency" DGTX, a commodity, in an attempt to manipulate the price of a commodity in interstate commerce. Defendants took actions that were an extreme departure from the standard of ordinary care and should have known their actions could create or affect a price or price trend that did not reflect legitimate forces of supply and demand. Defendants took overt actions in furtherance of an attempt to manipulate the price of a commodity in interstate commerce.

Todd is directly liable for his acts and omissions. The acts and omissions of Todd and other officers, employees, or agents acting for Digitex Futures described in the Amended Complaint were done within the scope of their office, employment, or agency with Digitex Futures. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Digitex Futures is liable as a principal for each act, omission, or failure of the other officers, employees, or agents acting for Digitex Futures, constituting violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a). Each and every overt action in furtherance of the attempt to manipulate prices, and each act of attempted manipulation is a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

**C. Count III Against All Defendants: Execution of Futures Transactions on an Unregistered Board of Trade**

Between July 31, 2020 and September 30, 2022, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, Blockster Holdings Limited Corporation, all acting as a common enterprise and doing business as Digitex Futures, and through the acts or omissions of Todd and their officers, employees, and agents, violated 7 U.S.C. § 6(a) by:

    a.  confirming the execution of contracts for the purchase or sale of digital assets for future delivery; and

    b.  conducting an office or business in the U.S. for the purpose of soliciting, or accepting any order for, or otherwise dealing in, any transaction in, or in connection with contracts for the purchase or sale of digital assets for future delivery—

without conducting its futures transactions on or subject to the rules of a board of trade that was designated or registered by the CFTC as a contract market. Each offer to enter into, execution of, and/or confirmation of the execution of illegal off-exchange futures transactions, was a separate and distinct violation of 7 U.S.C. § 6(a).

During the Relevant Period, Todd directly or indirectly controlled Digitex Futures, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Digitex Futures' violations described in the Amended Complaint. Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Todd is therefore liable for Digitex Futures' violations to the same extent as Digitex Futures.

**D. Count IV Against All Defendants: Failure to Register as a Futures Commission Merchant**

Between July 31, 2020 and September 30, 2022, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation, and through the acts and

omissions of Todd and their officers, employees, and agents, operated as an Futures Commission Merchant ("FCM") by:

    a.  engaging in soliciting or accepting orders for the purchase or sale commodities for future delivery;

    b.  and, in or in connection with these activities, accepting money, securities, or property (or extending credit in lieu thereof) to margin, guarantee, or secure resulting trades on the Exchange.

Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation, all acting as a common enterprise and doing business as Digitex Futures, and through the acts and omissions of Todd and their officers, employees, and agents, violated 7 U.S.C. § 6d by failing to register with the Commission as a FCM. Each act in violation of 7 U.S.C. § 6d was a separate and distinct violation.

Todd directly or indirectly controlled Digitex Futures and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Digitex Futures' violations of 7 U.S.C. § 6d. Therefore, pursuant to 7 U.S.C. § 13c(b), Todd is liable as a control person for each of Digitex Futures' violations of 7 U.S.C. § 6d.

### E. Count V Against All Defendants: Failure to Implement Customer Information Program, and Failure to Implement Know Your Customer and Anti-Money Laundering Procedures

Between July 31, 2020 and September 30, 2022, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation, all acting as a common enterprise and doing business as Digitex Futures, operated as an FCM. FCMs are required comply with 17 C.F.R. § 42.2 (2022). Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation, all acting as a common enterprise and doing business as Digitex Futures, and through Todd and their officers, employees, and agents, violated 17 C.F.R.

§ 42.2 by failing to implement a Customer Information Program, failing to implement KYC policies and procedures, failing to implement an Anti-Money Laundering program, failing to retain required customer information, and failing to implement procedures to determine whether a customer appears on lists of known or suspected terrorists or terrorist organizations such as those issued by OFAC.

Each act in violation of 17 C.F.R. § 42.2 was a separate and distinct violation. Todd directly or indirectly controlled Digitex Futures and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Digitex Futures' violations of 17 C.F.R. § 42.2. Therefore, pursuant to 7 U.S.C. § 13c(b), Todd is liable as a control person for each of Digitex Futures' violations of 17 C.F.R. § 42.2.

Unless restrained and enjoined by this Court, there is a reasonable likelihood that Todd and Digitex Futures will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

## VI.    RELIEF SOUGHT

Under 7 U.S.C. § 13a-1, the CFTC may seek various categories of equitable relief and civil monetary penalties ("CMP") from defendants found to have violated the Act. The Commission requests that the Court enter permanent injunctions and order disgorgement and CMPs, jointly and severally, for all Defendants.

### A. The Court Should Enter Permanent Injunctions Against All Defendants.

"The CEA allows a district court to grant a permanent or temporary injunction." *CFTC v. So. Tr. Metals,* 894 F.3d 1313, 1328 (11th Cir. 2018) (citing 7 U.S.C. § 13a-1(b)). "[T]he ultimate test [for an injunction] is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *Id.* (quoting *CFTC v. Wilshire Inv. Mgmt. Corp.,* 531

F.3d 1339, 1346 (11th Cir. 2008)).  *Southern Trust Metals* sets forth six non-dispositive  factors to

consider  when assessing whether to impose  a permanent injunction:

> the egregiousness  of the defendant's  actions,  the isolated  or recurrent nature of the
> infraction,  the degree of scienter involved,  the sincerity  of the defendant's  assurances
> against future violations, the defendant's  recognition  of the wrongful  nature of his conduct,
> and the likelihood  that the defendant's  occupation  will present opportunities  for future
> violations.

894 F.3d at 1328.  The *Southern Trust Metals* factors all cut strongly  in favor of the imposition  of

permanent injunctions  that would prohibit  Defendants from, among other things, participating  in

U.S. derivatives  markets on a going  forward basis.

The conduct described in the Amended Complaint  is egregious.  Todd  created an illegal

digital  asset exchange, along  with a "native token," and intentionally  manipulated  or attempted  to

manipulate  the price of that token to line his pockets at the expense of Digitex  customers.  Todd's

text messages are *direct evidence* of his manipulative  intent; the Court does not even need to draw

an inference of scienter.  And Todd's own brazen commentary—in  videos he proudly  posted to

YouTube—reflects  his awareness of AML and KYC requirements that apply  to FCMs and Todd's

conscious  choice to avoid complying  with those prophylactic  rules that protect the U.S. financial

system from abuse by criminals  and terrorists.  Further  reflecting  a high degree of scienter and

likelihood  of future violations, Defendants' conduct was not isolated; the Exchange Period spanned

years and the Attempted Manipulation  Period lasted weeks if not longer.

Nor has Todd even attempted to accept responsibility  for his conduct.  He refused to respond

to CFTC-issued investigative  subpoenas and has not appeared in this litigation.  Evidence in the

record shows Todd knew his conduct was illegal.   He once discussed fleeing the United States

because "[i]f launch goes well probably  should leave US for 6 months I'll be running  an unregulated

futures exchange."  (ECF No. 18-1 (A. Schrimpf  Aff. ¶ 4, Attach. 3.)  Attempting  to avoid

accountability and ignoring legal process is evidence that a Defendant is likely to violate the law in the future.

Taken together, these facts show there is a reasonable likelihood that Defendants will violate the Act in the future. As a result, the Commission respectfully requests that the Court enter an injunction against all Defendants, prohibiting them from directly or indirectly:

i.  attempting to manipulate the price of a commodity in interstate commerce in violation of 7 U.S.C. §§ 9(3) and 13(a)(2) and 17 C.F.R. § 180.2 (2022);

ii.  using a manipulative or deceptive device or contrivance in connection with the sale of a commodity in an attempt to manipulate the price of a commodity in interstate commerce in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) (2022);

iii.  confirming the execution of contracts for the purchase or sale of digital assets for future delivery; and conducting an office or business in the U.S. for the purpose of soliciting, or accepting any order for, or otherwise dealing in, any transaction in, or in connection with contracts for the purchase or sale of digital assets for future delivery without conducting its futures transactions on or subject to the rules of a board of trade that was designated or registered by the CFTC as a contract market in violation of 7 U.S.C. § 6(a);

iv.  operating as an unregistered FCM by engaging in soliciting or accepting orders for the purchase or sale commodities for future delivery; and, in or in connection with these activities, accepting money, securities, or property (or extending credit in lieu thereof) to margin, guarantee, or secure resulting trades on an exchange in violation of 7 U.S.C. § 6d;

v.  failing to implement a CIP, failing to implement KYC policies and procedures,

failing to implement an Anti-Money Laundering program, failing to retain required customer information, or failing to implement procedures to determine whether a customer appears on lists of known or suspected terrorists or terrorist organizations such as those issued by OFAC in violation of 17 C.F.R. § 42.2 (2022).

Defendants should also be permanently restrained, enjoined and prohibited from directly or indirectly:

i.    trading on or subject to the rules of any registered entity (as that term is defined in Section la of the Act, 7 U.S.C. § la(40));

ii.   entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2022)) or digital assets that are commodities (as that term is described in the Amended Complaint), for Defendants' own accounts or for any account in which they have a direct or indirect interest;

iii.  having any commodity interests or digital assets that are commodities (as that term is described in the Amended Complaint) traded on Defendants' behalf;

iv.   controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital assets that are commodities (as that term is described in the Amended Complaint);

v.    soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests or digital assets that are commodities (as that term is described in the Amended Complaint);

vi.   applying for registration or claiming exemption from registration with the

Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022);

vii.   acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9).

**B. Disgorgement of Ill-Gotten Gains is Appropriate.**

7 U.S.C. 13a-1(d)(3) authorizes the Court to order disgorgement. As this Court has explained, "disgorgement [is] appropriate for any gains received in connection with" violations of the Act. *CFTC v. So. Tr. Metals, Inc.*, 391 F. Supp. 3d 1167, 1171 (S.D. Fla. 2019). "The CFTC has the burden to produce a reasonable approximation of a defendant's ill-gotten gains to sustain a disgorgement amount." *CFTC v. Tayeh*, 848 F. App'x 827, 829 (11th Cir. 2021); *see also SEC v. Monterosso*, 756 F.3d 1326, 1337 (11th Cir. 2014) ("exactitude is not a requirement").

The Commission's request for disgorgement is based on evidence in the record—chiefly Defendant Todd's own statements made in contemporaneous communications—and has been reduced to a sum certain, as described below. The Court should order Defendants to disgorge, jointly and severally,[4] all funds or dollar equivalents of DGTX transferred from customers to the Digitex Futures platform during the Relevant Period.

Todd ignored document subpoenas issued during the CFTC's pre-suit investigation and did

---

[4] Courts frequently impose disgorgement on a joint and several basis. *See FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1241–42 (11th Cir. 2017) (affirming joint and several disgorgement award); *So. Tr. Metals*, 391 F. Supp. 3d at 1172–73 (same and collecting authority). The Supreme Court's recent *Liu v. SEC* decision does not disturb this well-established rule. *See* 140 S. Ct. 1936, 1949 (2020) (recognizing "flexib[le]" authority for courts to impose disgorgement on a joint and several basis against defendants "engaged in concerted wrongdoing").

not appear to defend this lawsuit (therefore sidestepping civil discovery). As a result, Todd has avoided producing financial and accounting records concerning Digitex's operations. However, according to Todd's own communications, 1,500 customers deposited at least $1.5 million worth of DGTX into the Exchange in the seven days prior to August 4, 2020. (*Id.* ¶ 74; *see also* Patrick Decl. ¶ 14.) According to documents Todd provided to Customer A, during the first two months after the Exchange's "public launch" on July 31, 2020, at least 13,920 customers deposited $2,412,220 worth of DGTX into accounts at the Exchange. (Am. Compl. ¶ 75; *see also* Patrick Decl. ¶ 15.) Because Digitex was the sole initial source of DGTX tokens, the value of the DGTX that was deposited back into the Exchange by customers is a reasonable proxy for the *minimum* total ill-gotten gains received by Defendants in connection with the operation of their illegal Exchange. Therefore, the Commission recommends that the Court order disgorgement against Defendants on a joint and several basis in the amount of $3,912,220 pursuant to 7 U.S.C. § 13a-1(d)(3).

## C. Civil Monetary Penalty

7 U.S.C. § 13a-l(d)(1)(A) authorizes the Court to impose civil monetary penalties on defendants that violated the Act and states:

> [i]n any action brought under this section, the Commission may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation—
>
> > (a) a civil penalty in the amount of not more than the greater of $100,000 or triple the monetary gain to the person for each violation; or
> >
> > (b) in any case of manipulation or attempted manipulation in violation of section 9, 15, 13b, or 13(a)(2) of this title, a civil monetary penalty in the amount of not more than the greater of $1,000,000 or triple the monetary gain to the person for each violation.

Adjusted for inflation, those statutory civil monetary penalty amounts are now $214,514 per violation for standard regulatory violations and $1,494,520 per violation for manipulation and

attempted manipulation for violations occurring on or after November 2, 2015. *See Annual Adjustment of Civil Monetary Penalties to Reflect Inflation—2023*, 88 Fed. Reg. 1501, 1501-1502 (Jan. 11, 2023).

For purposes of imposing a civil monetary penalty, "[c]onduct that violates core provisions of the Act's regulatory system—such as manipulating prices or *defrauding customers should be considered very serious.*" *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995) (emphasis in original). Civil monetary penalties should "reflect the abstract or general seriousness of each violation and should be sufficiently high to deter future violations," which means that civil monetary penalties should make it financially detrimental to a defendant to fail to comply with the Act and Regulations so that the defendant would rather comply than risk a violation. *In re Grossfeld,* CFTC Docket No. 89-23, 1996 WL 709219 at *12, *aff'd, Grossfeld v. CFTC*, 137 F.3d 1300 (11th Cir. 1998).

This case warrants a significant civil monetary penalty because Defendants intentionally attempted to manipulate the price of a commodity, which is a violation of the Act's "core provisions." *JCC, Inc.*, 63 F.3d at 1571. The Act authorizes the Court to impose a civil monetary penalty of up to three times the gain to the defendant. *See* 7 U.S.C. 13a-1(d)(1)(A); *see also CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1353 (S.D. Fla. 2014) (imposing penalty in the amount that was triple the defendants' monetary gain). As set forth above, Defendants represented to U.S. customers a gain in connection with their violations of the Act totaled at least $3,912,220. The CEA thus authorizes a civil monetary penalty of up to three times that amount, or $11,736,660.

The statute alternatively permits assessment of a civil monetary penalty for each violation of the act. Todd made emphatically clear on YouTube that Digitex Futures would not engage in

KYC, yet he represented that he onboarded at least 15,400 customers in the early months of the Exchange's operation. Based on that number of individual violations of Regulation 42.2 alone, the civil monetary penalty of $214,514 per violation could be multiplied by 15,400 customers for a maximum of $3,303,515,600. Despite this eye-popping example, the Commission recommends a more reasonable calculation of triple the monetary gains Defendants represented they received.

The Commission respectfully requests the Court order Defendants to pay the maximum civil monetary penalty authorized by the Act, $11,736,660, which is reflective of Defendants' serious misconduct, which includes knowing participation in a long-running, intentional attempted manipulation scheme on an unregistered exchange, plans to flee the country once the unregistered exchange launched, and refusal to participate in these proceedings, all of which reflects a lack of acceptance of responsibility for wrongdoing and likelihood of future violations.

## VII.   CONCLUSION

The Commission respectfully requests that the Court grant the Motion and enter the concurrently-filed Proposed Order for Judgment by Default against all Defendants, imposing the injunctive and monetary relief set forth therein and described above.

Dated: June 12, 2023                 Respectfully submitted,

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION
77 W. Jackson Blvd., Suite 800
Chicago, Illinois 60604
(312) 596-0714 facsimile
(312) 596-0700

*/s/ Ansley H. Schrimpf*
Ansley H. Schrimpf
Trial Attorney
Special Bar ID #A5502922

aschrimpf@cftc.gov

Joseph C. Platt
Trial Attorney
Special Bar ID #A5502676
jplatt@cftc.gov

Allison V. Passman
Chief Trial Attorney
Special Bar ID #A5502489
apassman@cftc.gov

**CERTIFICATE OF SERVICE**

       The undersigned, an attorney for Plaintiff Commodity Futures Trading Commission, hereby certifies that a true and accurate copy of Plaintiff's Motion for Final Judgment by Default, Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief Against All Defendants has been served on all counsel that have appeared in this action via the CM/ECF system and by the following means pursuant to Court order:

       Service on Defendant Adam Todd
       *by email to adamtodd@yahoo.com*

       Service on Defendants Digitex, LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation
       *by email to their principal Adam Todd to adamtodd@yahoo.com*


Dated: June 12, 2023               Respectfully submitted,


                         */s/ Ansley H. Schrimpf*
                         Trial Attorney
                         ONE OF THE ATTORNEYS
                         FOR PLATINIFF
                         COMMODITY FUTURES
                         TRADING COMMISSION