## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| ADAM TODD, DIGITEX LLC, DIGITEX LIMITED, DIGITEX SOFTWARE LIMITED, AND BLOCKSTER HOLDINGS LIMITED CORPORATION (D/B/A DIGITEX FUTURES) | ) ) ) ) ) ) |
| Defendants. | ) ) ) ) ) |

CIVIL ACTION NO: 1:22-cv-23174-RKA

Hon. Roy K. Altman

### [PROPOSED] ORDER FOR FINAL JUDGMENT BY DEFAULT, PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES, AND OTHER STATUTORY AND EQUITABLE RELIEF

On September 30, 2022, Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC"), filed a Complaint charging Defendants **Adam Todd, Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation ("Defendants")** with, among other charges, violating Section 4(a) of the Commodity Exchange Act (the "Act" or "CEA"), 7 U.S.C. § 6(a); Section 4d of the Act, 7 U.S.C. § 6d; Sections 6(c)(1), 6(c)(3) and 9(a)(2) of the Act, 7 U.S.C. §§ 9(1), 9(3), and 13(a)(2); and Commission Regulations ("Regulations") 42.2, 180.1(a), and 180.2, 17 C.F.R. §§ 42.2, 180.1(a), and 180.2 (2022). (*See* ECF No. 1.)

Between December 2017 and at least September 30, 2022, (the "Relevant Period"), Defendant Adam Todd ("Todd") owned, built, and operated an illegal digital asset derivatives trading platform through a common enterprise of corporate entities that he owned and controlled,

including Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation. This Order refers collectively to the entity Defendants listed in the preceding sentence as "Digitex Futures" and the web-based exchange as the "Exchange." Through the operation of the Exchange and the activities described in greater detail below, Digitex Futures and Todd violated applicable sections of the Act.

On February 22, 2023, Defendants were properly served by substitute service with summonses and the Amended Complaint pursuant to Rule 4 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") and Florida Statute § 48.181. All Defendants have failed to appear or answer the Amended Complaint within the time permitted by Fed. R. Civ. P. 12(a)(1). Accordingly, the Commission filed a motion for entry of a clerk's default against Defendants and on May 23, 2023, the Clerk of this Court entered a default against Defendants.

The Commission has moved this Court to grant final judgment by default against Defendants, order permanent injunctive relief, and impose a disgorgement obligation and civil monetary penalty.

The Court has carefully considered the Amended Complaint, the allegations of which are well-pleaded and hereby taken as true, the Commission's memorandum in support of its motion, the record in this case, and the Court being otherwise advised in the premises, it is hereby:

**ORDERED** that the Plaintiff's Motion for Final Judgment by Default, Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief against Defendants is **GRANTED.** Accordingly, the Court enters findings of fact, conclusions of law, and an Order of Final Judgment by Default for Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief ("Order") pursuant to Sections 6c and 6d of the Act, 7 U.S.C. §§ 13a-1, 13a-2, as set forth herein.

## I.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A.    Findings of Fact**

**i.    The Parties**

1.    Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the CEA and Regulations promulgated thereunder.

2.    **Digitex Limited**, **Digitex Software Limited**, **Blockster Holdings Limited**, and **Digitex LLC** are a common enterprise of corporate entities that comprise Digitex Futures, as defined above, which operated the Exchange from an office in Miami, Florida.  None of the entities comprising Digitex Futures has ever been registered with the Commission in any capacity.  Digitex Limited was registered in the Republic of Seychelles on December 11, 2017.  Digitex Software Limited was registered in Ireland on March 8, 2018, and operated in Dublin with a small staff of software developers for several months.  At all times relevant to the Amended Complaint, Todd owned Digitex Limited and Digitex Software Limited.  Since at least January 27, 2021, Todd has co-owned Blockster Holdings Limited, a Gibraltar entity.  On April 27, 2021, Todd and Blockster Holdings Limited applied to form Digitex LLC in St. Vincent & the Grenadines.

3.    Defendant **Adam Todd** is a natural person who resided in Miami, Florida during much of the Relevant Period.  Todd is the founder and CEO of Digitex Futures.  Todd owned and controlled all of the entities comprising Digitex Futures at all times relevant to this complaint.  Todd has never been registered with the Commission in any capacity.

**ii.    The Digitex Futures Exchange and Products**

4.    Todd principally operated Digitex Futures from Miami, Florida.

5.    Todd published his "white paper" on the internet on December 5, 2017.  The "white paper" is titled "DIGITEX—A commission-free, trustless futures exchange for trading digital

currency prices . . . v.1.1," and theorizes about a platform with commission-free trading in which all profits, losses, margin requirements, and account balances on the Exchange would be denominated in its "native currency," DGTX. In lieu of transaction fees for digital asset futures trading, Digitex Futures was to earn revenue by selling DGTX to the Exchange's market participants, commencing in January 2018. Out of the contemplated supply of 1 billion DGTX tokens, at least 300 million would be retained by Todd and Digitex Futures.

6.      Beginning January 15, 2018, customers could obtain DGTX tokens directly from Digitex Futures at the digitexfutures.com or digitex.io websites, or in the secondary market by trading at third-party digital asset exchanges. Todd publicly represented in 2018 that the Digitex Futures' initial DGTX token sales raised $5.2 million in 17 minutes.

7.      Todd's business plan called for periodic sales of tranches of DGTX to the public after the launch of the Exchange to generate revenue for Digitex Futures. Sales of DGTX were the sole source revenue for Digitex Futures, consistent with Todd's "white paper." Beginning in 2019, the Digitex Futures "treasury" sold DGTX tokens to customers at a 5% mark-up over the DGTX price, as published by CoinMarketCap, a third-party aggregator of digital asset-related information.

8.      Traders were required to hold DGTX to participate on the Exchange, where DGTX served multiple specific purposes. For example, traders were required to maintain margin balances denominated in DGTX, minimum "tick sizes" on the Exchange equaled the value of one DGTX token, and traders' profit-and-loss was denominated in terms of DGTX.

9.      DGTX tokens did not confer any ownership rights in the Exchange and did not permit the token holder to participate in any matters concerning the corporate governance of Digitex Futures.

10.     According to Todd's "white paper," Digitex Futures intended to offer DGTX futures contracts to Exchange users so users could hedge any price risk associated with their DGTX tokens. These DGTX futures contracts, called a "peg system," would "allow[ ] anyone who owns DGTX tokens to lock in a sale price at the current market price, whilst keeping physical possession of their DGTX tokens . . . ."

11.     DGTX was a digital asset, a digital representation of value that functioned as a medium of exchange, and also traded on web-based trading platforms that were accessible to market participants in the United States, including Todd, and therefore was a commodity in interstate commerce.

12.     Todd and Digitex Futures launched the Exchange on July 31, 2020.  During the approximate two years the Exchange operated, Digitex Futures offered to enter into or execute, and accepted funds to margin, transactions in off-exchange leveraged digital asset futures to customers in the U.S. and throughout the world.  Digitex Futures made the Exchange accessible on its website, available variously at the U.S.-hosted URLs www.digitexfutures.com and www.digitex.io, and through the Digitex Futures mobile application, until the Exchange was removed from the website in May 2022.

13.     Digitex Futures allowed customers to trade at least two futures contracts: bitcoin/USD and ether/USD.  Transactions in these futures contracts that were entered into on the Exchange did not occur on a designated contract market ("DCM") or foreign board of trade ("FBOT") DCM or FBOT; instead, Digitex Futures purported to operate its own unregulated trading platform.

14.     Digitex Futures' "white paper" provided the standardized contract specifications for its futures contracts, which were fungible contracts that featured a 24-hour duration with an

automatic "roll" of any open positions into a new contract at the end of the trading day. A transaction in the Exchange's futures contracts did not result in a transaction in the underlying digital asset or delivery of the underlying digital asset, and Digitex Futures customers were required to exit a position in the futures contracts through an offsetting transaction on the Exchange.

15.     For each contract listed on the Exchange, the customer interface displayed the relevant contract's price, transaction volume over the most recent 24 hours, a 7-day price chart, and the unexecuted orders to buy and sell at various prices that made up the Exchange's central limit order books, sometimes called price "ladders." The Exchange's customer interface also displayed mechanisms by which customers could submit orders, including a button that said "trade."

16.     The Exchange allowed customers to place buy and sell orders in an electronic order book and matched customer orders in what it called its "trading engine."

17.     The Exchange allowed customers to exchange bitcoin or ether for DGTX, and customers could use DGTX to margin, guarantee, or secure futures transactions on Digitex Futures.

18.     Digitex Futures acted as the counterparty to transactions on its platform due to its trading as a "market-maker" in various products.

19.     Digitex Futures deployed a smart contract to accept customer funds in the form of DGTX as margin and controlled the circumstances under which a customer's collateral was subject to a margin call.

### iii.     Todd Controlled Digitex Futures and Operated Digitex Futures as a Common Enterprise.

20.     At all relevant times, Todd was the majority shareholder or owner of each of the various corporate entities that comprise Digitex Futures and exercised general control over the Exchange's operations.

21.     Since January 2018, Todd controlled virtually all material aspects of the Digitex Futures business, including strategic decisions, business development, and marketing of Digitex Futures.  For example, Todd has:

a.  been responsible for building and overseeing the Exchange's trading engine;

b.  determined the contract specifications of Digitex Futures' financial products;

c.  overseen the development of and deployment of the Digitex Futures' internal market maker trading algorithms, which engaged in proprietary trading on the Exchange;

d.  signed contracts for Digitex Futures;

e.  controlled Digitex Futures' bank and trading accounts; and

f.  hired, fired, and determined the compensation of Digitex Futures employees.

22.     Digitex Futures operated as a common enterprise at all relevant times.  Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited were interrelated companies that shared common ownership and management through Todd, as well as common employees, software development resources, email domains, office space, and marketing efforts.

23.     Blockster Holdings Limited holds the U.S. trademark on the word "Digitex" and the trademark application described Digitex's Goods and Services as including the following items:

a.  "Cryptocurrency exchange services;"

b.  "Cryptocurrency trading services;"

c.  "Futures brokerage;"

d.  "Futures exchange services;"

e.  "Agencies for commodity futures trading;"

f.  "Brokerage houses in the fields of stocks, commodities and futures;"

g.  "Financial brokerage services for cryptocurrency trading;"

h.  "Financial services, namely, dealing in securities as a market maker and trading commodities, options, futures, equities and fixed income products in the United States and overseas market securities;" and

i.  "Financial services, namely, proprietary trading in commodities, securities, options, futures, equities and fixed income products in the United States and overseas market securities."

**iv.  Digitex Futures Failed To Implement an Effective Anti-Money Laundering Program, KYC Procedures, or a Customer Information Program.**

24.  Know Your Customer ("KYC") procedures and Customer Information Programs ("CIPs") collect verifiable customer identifying information such as a copy of a government-issued ID or beneficial ownership information that allows a financial services firm like an FCM to know who its customers are and where they are located.

25.  After the Digitex exchange was launched, Digitex Futures failed to implement an AML program and did not implement any KYC procedures or a CIP that would have enabled it to identify U.S. persons on the platform—or the true identity of its customers, whether from the U.S. or elsewhere.

26.  This was intentional.  In March 2020, more than four months before the exchange launched, Digitex Futures posted a YouTube video of Todd conceptually disparaging anti-money laundering programs (in particular, KYC procedures) and stating his refusal to comply with them:

> We do not need to do KYC.  People are not laundering ethereum into Digitex to fund international terrorism.  It's [expletive] ridiculous to say that. I'm calling out the charade, for the crock of [expletive] that it is. We are not doing KYC on anybody for any reason. . . .  We don't have the right to ask you for those documents, you should not have to give them in order to use my product. You should not have to give them because the U.S. government or whatever other [expletive] government in the world says that you need to. You do not need to. You just do not.

27.  Digitex Futures allowed customers to open accounts with only an anonymous email and password, and did not require that customers provide any additional identity-verifying documentation.

28.     As Digitex Futures' CEO and principal owner, Todd had control over whether or not Digitex Futures would implement an effective AML program, a CIP, or KYC procedures.

**v.     Todd and Digitex Futures Attempted to Manipulate the Price of DGTX Tokens**

29.     Between May 1, 2020 and August 15, 2020 (the "Attempted Manipulation Period"), Todd attempted to artificially increase the price of DGTX tokens. As founder and control person of Digitex Futures (and by extension, the individual who controlled the issuance and primary sales of the Exchange's "native currency" DGTX), Todd had inside information concerning the supply of DGTX and ability to impact the price of DGTX.

30.     Todd's attempted manipulation generally consisted of trying to drive up, or "pumping," the price of DGTX by touting DGTX and the Exchange to increase demand for DGTX and engaging in non-economic trading activity on third-party exchanges to benefit Defendants' accumulated positions in DGTX. Digitex Futures required customers to own DGTX to trade on the platform.

31.     The price of DGTX rose sharply during the Attempted Manipulation Period, consistent with Todd's communications, as reflected below in the price chart based on data maintained and generated by CoinMarketCap. This chart shows the price of DGTX between May 1, 2020 and September 15, 2020; the y-axis is denominated in U.S. dollars.



32.    Todd's scheme to pump the price of DGTX included buying DGTX on third-party exchanges—notwithstanding Todd's and Digitex Futures' ownership of hundreds of millions of DGTX tokens. Todd's trading activity on third-party exchanges was intended to increase the market price that was reflected on those exchanges, which in turn was incorporated into the price of DGTX as reported by CoinMarketCap. Because Digitex Futures priced its direct sales of DGTX based on CoinMarketCap's reported price, Todd's plan was therefore intended to increase the price at which Digitex Futures could sell DGTX out of its "treasury."

33.    Todd's plan was exemplified by communications and transactions between Todd and a Digitex Futures' customer ("Customer A"), who is a U.S. citizen that resided in Illinois during the Attempted Manipulation Period. In late June 2020, Todd and Customer A began discussing Todd's plan to manipulate the price of DGTX to its all-time high price just ahead of the launch of the Digitex Futures Exchange on July 31, 2020. Todd explained his intention to influence the price of DGTX to customer A on June 24, 2020, when DGTX was trading at a price of 3.5 cents per token:

> Big exchange listing confirmed for July 3rd so it's gonna pop then. July 10th we'll announce the big public launch and livestream trading event for end of July with $300k of prizes and giveaways on the day and I'll have a bunch of big influencers

and trading view traders coming in as guests and talking about how they trade on [Digitex Futures]. Price will break ATH[1] by this launch I think and then shortly after that we'll drop the Digitex City whitepaper which will be very bullish and then we'll launch the Digitex Spot market and then we'll announce our first big $50m IEO/STO which is Blockster. DGTX price going to go crazy in July dude, hang on . . . .

34.    On July 8, 2020, Todd predicted to Customer A: "DGTX will pop on July 17th."

35.    Throughout July 2020, Todd promoted the July 31, 2020 Exchange launch on social media platforms and the Digitex Futures blog and enlisted others to help him generate interest in DGTX and the Exchange. Todd told U.S. Customer A that "[a] big crypto youtuber is announcing the launch date on July 17th and he will talk about Digitex on his show for 6 minutes saying that we're back from the dead and the exchange is great and there's loads of users and he's trading on there and he loves it and DGTX is going to blow up."

36.    By July 16, Todd reported to Customer A: "Things are heating up. DGTX at 52 week high."

37.    Digitex Futures also marketed DGTX's increasing prices to the public. On July 20, 2020, Digitex Futures tweeted: "Growing demand has pushed the price up by nearly 167% throughout July. Despite the massive gains already posted, different on-chain metrics suggest #DGTX is poised for higher highs." At this time, Digitex Futures did not publicize the fact that its owner, Todd, was engaged in non-economic trading activity on third-party exchanges for the purpose of "pumping" the price of DGTX.

38.    While soliciting money from Customer A on July 23, 2020, Todd described his intent to push up the DGTX token price: "I want to do a big pump this week to break our ATH leading up to the launch day and get the FOMO[2] going crazy so if you can get me that $300k by

---

[1] ATH is slang for "all time high" in the digital asset space.

[2] FOMO is slang for "fear of missing out" in the digital asset space.

tomorrow . . . . I'll spend the lot on buying DGTX over the weekend 💥 💲[.]"  Customer A wired

$300,000 to Todd's personal bank account on July 23, 2020.

39.     Between July 23, 2020 and the July 31, 2020 Exchange "public launch," both Todd

and Customer A continued to enter bids (buy orders) on a third-party exchange to purchase DGTX,

putting upward pressure on the price.  For example, on July 24, 2020, Todd reported to Customer A

that as a result of his relentless DGTX buying, to which Todd represented he committed "$100k in

last 12 hours," Todd finally "broke" a 10.2-cent price barrier set by sellers in the DGTX market.

40.     On July 25, 2020, Customer A told Todd he "bought about $50k." Todd responded

that he bought "$150 DGTX" and reported that the price "just popped to 11 [cents]. There were

some aggressive sellers but looks like they ran out of tokens." Customer A subsequently told Todd

that he bought another 1 million DGTX tokens and "Got [the DGTX token price] back up to 11

cents."

41.     On July 29, 2020, two days before the Exchange "public launch," Todd described

the mechanics of his plan to Customer A to manipulate the price of DGTX through non-economic

trading:

> I'm setting up OTC sales desk to get big fiat buy orders coming in which I will then
> fill by aggressively buying on [another exchange] . . . That will be the key to the big
> move I think. . . . I'll be losing money on the otc trades but should get [the price of
> DGTX] pumping.

In other words, Todd hoped to receive large orders for DGTX directly from market participants (as

opposed to through orders placed on the Exchange), and then take the money he received from those

prospective purchasers and use it to buy DGTX on third-party digital asset trading platforms (as

opposed to simply filling the order out of the Digitex Futures "treasury," which held hundreds of

millions of DGTX tokens with a cost basis to Digitex Futures of zero). This transaction pattern—

realize trading losses while filling off-exchange orders (also called over-the-counter or "OTC"

orders) on third-party platforms to pump the price of DGTX—is exactly what Todd stated he would do with Customer A's $300,000 cash transfer, described above, on July 23.

42.     Customer A asked why Todd anticipated losing money on the over-the-counter trades—that is, Customer A asked Todd why Todd would engage in non-economic trading. Todd replied that he hoped to benefit from his pumping activity due to the impact the increased price of DGTX would have on the value of the holdings of the Digitex Futures "treasury":

> I'll sell big block of dgtx [in an OTC transaction] and then I will take that money and buy DGTX with it on [another exchange] at higher prices than I just sold for to pump it up some more. Rinse and repeat, every big otc buy order I'll send straight into [another exchange]. . . . But with a higher price I make more from the Digitex Treasury sales on the website. . . . . Treasury sells at 5% premium on cmc price you can see the price on the Buy DGTX page of the website. . . . So it doesn't exert any downward pressure on the price because only people who don't want to deal with a crypto exchange buy from the treasury.

43.     On July 31, 2020, Todd hosted a 5-hour live YouTube launch during which he continued to tout the DGTX price, stating "the token price was at 4 cents at the start of July and it went to 12 cents." During the livestream, Todd did not disclose his own non-economic trading activity and instead predicted the DGTX price would reach $1 per token by the end of 2020 while downplaying the risks of trading on the Exchange and price volatility of DGTX:

> So, yes, you do have to hold the Digitex token in order to benefit from very liquid markets with no cost at all, but holding the Digitex token is actually a good thing. You can make money from trading on the exchange and during that time your tokens are also becoming more valuable.
>
> So, you know, it's actually a double whammy while we're moving up, and for the foreseeable future, we're going to be moving up because we've got crazy, crazy plans to create just ridiculous demand for the Digitex token.

44.     Todd falsely assured an "influencer" interviewing him during the Exchange launch that the liquidity on the Exchange "is not being provided by me or the exchange. [T]his liquidity is coming from other traders that are trading just like I am doing now."

45.     Later in the live launch, another "influencer" asked Todd about the approximate 200% increase in the token price in the weeks leading up to the launch.  Todd responded:  "Right, and we sold millions of tokens during that time. . . . You would think that selling tokens means the price goes down. It really doesn't."  Todd did not disclose to this "influencer" that he was engaging in non-economic trading activity in DGTX on third-party exchanges with the intent to "pump" the price of DGTX.

46.     Todd continued his efforts to solicit or retain funds from Customer A after the Exchange's "public launch" by disclosing his plan to pump the price of DGTX through activity on other exchanges.  For example, the day after the Exchange launched, Todd told Customer A that he planned to put $100,000 into his "pump machine bot," which Todd explained was an algorithmic trading strategy he deployed on other exchanges to drive up the price of DGTX.

47.     Thereafter, on August 4, 2020, Todd told Customer A that he held accounts on third-party digital asset exchanges with as much as 11.5 million DGTX for the purpose of creating "relentless pressure that isn't noticed as much because I do it through my market making bot that is always buying more than it is selling" to pump up the market price of DGTX.

48.     Todd resided in Florida during the Attempted Manipulation Period and therefore engaged in the "pumping" activity described above from the United States.

49.     According to Todd, 1,500 customers deposited at least $1.5 million worth of DGTX into the Exchange in the seven days prior to August 4, 2020.

50.     According to documents provided by Todd to Customer A, during the first two months after the Exchange's "public launch" on July 31, 2020, at least 13,920 customers deposited $2,412,220 worth of DGTX into accounts at the Exchange.

51.     Together, Todd's representations total $3,912,220 in ill-gotten gains.

52.      Through at least June 23, 2022, Digitex Futures continued to tout, mint, and sell DGTX tokens from the Digitex "treasury."

## B.      CONCLUSIONS OF LAW

### i.    Jurisdiction and Venue

53.      This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

54.      Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because the Defendants resided or transacted business in this jurisdiction and the acts and practices in violation of the Act and Regulations occurred, are occurring or are about to occur within this District, among other places.

### ii.   Count I Against All Defendants: Attempted Manipulation of the Price DGTX

55.      By the conduct described in paragraphs 1 through 3 and 29 through 52 above, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation, and Todd, all acting as a common enterprise and doing business as Digitex Futures, and their officers, employees, and agents, violated 7 U.S.C. §§ 9(3) and 13(a)(2) and 17 C.F.R. § 180.2 (2022) by, directly or indirectly, attempting to manipulate the price of "native currency" DGTX, a commodity in interstate commerce.

56.      Defendants, directly or indirectly, in connection with a contract of a commodity in interstate commerce, intentionally attempted to manipulate the price of a commodity in interstate commerce.

57.     Defendants specifically intended to create or affect a price or price trend that did not reflect legitimate forces of supply and demand.

58.     Defendants took overt actions in furtherance of an attempt to manipulate the price of a commodity in interstate commerce.

59.     The acts and omissions of Todd and other officers, employees, or agents acting for Digitex Futures described in this Complaint were done within the scope of their office, employment, or agency with Digitex Futures. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022), Digitex Futures is liable as a principal for each act, omission, or failure of the other officers, employees, or agents acting for Digitex Futures, constituting violations of 7 U.S.C. § 9(3) and 17 C.F.R. § 180.2.

60.     Each and every overt action in furtherance of the attempt to manipulate prices, and each act of attempted manipulation is a separate and distinct violation of 7 U.S.C. §§ 9(3) and 13(a)(2) and 17 C.F.R. § 180.2.

### iii.   Count Two Against All Defendants: Fraud and Manipulation by Deceptive Device or Contrivance

61.     By the conduct described in paragraphs 1 through 3 and 29 through 52 above, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, Blockster Holdings Limited Corporation, and Todd, all acting as a common enterprise and doing business as Digitex Futures, and their officers, employees, and agents, violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) (2022) by, directly or indirectly, using a manipulative or deceptive device or contrivance in connection with the sale of "native currency" DGTX, a commodity, in an attempt to manipulate the price of a commodity in interstate commerce.

16

62.     Defendants, directly or indirectly, in connection with a contract of a commodity in interstate commerce, recklessly attempted to manipulate the price of a commodity in interstate commerce.

63.     Defendants took actions that were an extreme departure from the standard of ordinary care and should have known their actions could create or affect a price or price trend that did not reflect legitimate forces of supply and demand.

64.     Defendants took overt actions in furtherance of an attempt to manipulate the price of a commodity in interstate commerce.

65.     The acts and omissions of Todd and other officers, employees, or agents acting for Digitex Futures described in this Complaint were done within the scope of their office, employment, or agency with Digitex Futures.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Digitex Futures is liable as a principal for each act, omission, or failure of the other officers, employees, or agents acting for Digitex Futures, constituting violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

66.     Each and every overt action in furtherance of the attempt to manipulate prices, and each act of attempted manipulation is a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

### iv.  Count III Against All Defendants: Execution of Futures Transactions on an Unregistered Board of Trade

67.     By the conduct described in paragraphs 1 through 23 and 49 through 52 above, since at least July 31, 2020, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, Blockster Holdings Limited Corporation, all acting as a common enterprise and doing business as Digitex Futures, and through Todd and their officers, employees, and agents, violated 7 U.S.C. § 6(a) by:

    a.  confirming the execution of contracts for the purchase or sale of digital assets for future delivery; and

    b.  conducting an office or business in the U.S. for the purpose of soliciting, or accepting any order for, or otherwise dealing in, any transaction in, or in connection with contracts for the purchase or sale of digital assets for future delivery—

without conducting its futures transactions on or subject to the rules of a board of trade that was designated or registered by the CFTC as a contract market.

68.    Each offer to enter into, execution of, and/or confirmation of the execution of illegal off-exchange futures transactions, was a separate and distinct violation of 7 U.S.C. § 6(a). During the Relevant Period, Todd directly or indirectly controlled Digitex Futures, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Digitex Futures' violations described in this Count. Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Todd is therefore liable for Digitex Futures' violations described in this Count to the same extent as Digitex Futures.

69.    Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022), Digitex Futures is liable as a principal for each act, omission, or failure of Todd and other officers, employees, or agents acting for Digitex Futures, constituting violations of 7 U.S.C. § 6(a).

**v.  Count IV Against All Defendants: Failure to Register as a Futures Commission Merchant**

70.    By the conduct described in paragraphs 1 through 1 through 23 and 49 through 52 above, since July 31, 2020, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation, and through Todd and their officers, employees, and agents, operated as an FCM by:

    a.  engaging in soliciting or accepting orders for the purchase or sale commodities for future delivery;

      b.   and, in or in connection with these activities, accepting money, securities, or property (or extending credit in lieu thereof) to margin, guarantee, or secure resulting trades on the Exchange.

71.     Since July 31, 2020, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation, all acting as a common enterprise and doing business as Digitex Futures, and through Todd and their officers, employees, and agents, violated 7 U.S.C. § 6d by failing to register with the Commission as a Futures Commission Merchant.

72.     Each act in violation of 7 U.S.C. § 6d, including, but not limited to, those specifically alleged in the Amended Complaint, was a separate and distinct violation.

73.     Todd directly or indirectly controlled Digitex Futures and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Digitex Futures' violations of 7 U.S.C. § 6d. Therefore, pursuant to 7 U.S.C. § 13c(b), Todd is liable as a control person for each of Digitex Futures' violations of 7 U.S.C. § 6d.

74.     Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022), Digitex Futures is liable as a principal for each act, omission, or failure of Todd and other officers, employees, or agents acting for Digitex Futures, constituting violations of 7 U.S.C. § 6d.

**vi.   Count V Against All Defendants: Failure to Implement Customer Information Program, and Failure to Implement Know Your Customer and Anti-Money Laundering Procedures**

75.     By the conduct described in paragraphs 1 through 28 above, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation, all acting as a common enterprise and doing business as Digitex Futures, operated as an FCM. FCMs are required comply with 17 C.F.R. § 42.2 (2022).

76.     Since July 31, 2020, Defendants Digitex LLC, Digitex Limited, Digitex Software Limited, and Blockster Holdings Limited Corporation, all acting as a common enterprise and doing

business as Digitex Futures, and through Todd and their officers, employees, and agents, violated and are continuing to violate 17 C.F.R. § 42.2 by failing to implement a Customer Information Program, failing to implement KYC policies and procedures, failing to implement an Anti-Money Laundering program, failing to retain required customer information, and failing to implement procedures to determine whether a customer appears on lists of known or suspected terrorists or terrorist organizations such as those issued by OFAC.

77.    Each act in violation of 17 C.F.R. § 42.2, including, but not limited to, those specifically alleged in the Amended Complaint was a separate and distinct violation.

78.    Todd directly or indirectly controlled Digitex Futures and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Digitex Futures' violations of 17 C.F.R. § 42.2. Therefore, pursuant to 7 U.S.C. § 13c(b), Todd is liable as a control person for each of Digitex Futures' violations of 17 C.F.R. § 42.2.

79.    Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022), Digitex Futures is liable as a principal for each act, omission, or failure of Todd and other officers, employees, or agents acting for Digitex Futures, constituting violations of 17 C.F.R. § 42.2. Unless restrained and enjoined by this Court, there is a reasonable likelihood that Todd and Digitex Futures will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

80.    Todd and Digitex Futures Must Disgorge Ill-Gotten Funds.

## II.    PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

79.    Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, Defendants are permanently restrained, enjoined and prohibited from directly or indirectly:

a.  attempting to manipulate the price of a commodity in interstate commerce in violation of 7 U.S.C. §§ 9(3) and 13(a)(2) and 17 C.F.R. § 180.2 (2022);

b.  using a manipulative or deceptive device or contrivance in connection with the sale of a commodity in an attempt to manipulate the price of a commodity in interstate commerce in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1a (2022);

c.  confirming the execution of contracts for the purchase or sale of digital assets for future delivery; and conducting an office or business in the U.S. for the purpose of soliciting, or accepting any order for, or otherwise dealing in, any transaction in, or in connection with contracts for the purchase or sale of digital assets for future delivery without conducting its futures transactions on or subject to the rules of a board of trade that was designated or registered by the CFTC as a contract market in violation of 7 U.S.C. § 6(a);

d.  operating as an unregistered Futures Commission Merchant by engaging in soliciting or accepting orders for the purchase or sale commodities for future delivery; and, in or in connection with these activities, accepting money, securities, or property (or extending credit in lieu thereof) to margin, guarantee, or secure resulting trades on an exchange in violation of 7 U.S.C. § 6d; and

e.  failing to implement a Customer Information Program, failing to implement KYC policies and procedures, failing to implement an Anti-Money Laundering program, failing to retain required customer information, or failing to implement procedures to determine whether a customer appears on lists of known or suspected terrorists or terrorist organizations such as those issued by OFAC in violation of 17 C.F.R. § 42.2 (2022).

80. Defendants are also permanently restrained, enjoined and prohibited from directly or indirectly:

    a.    trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a(40));

    b.    entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2022)) or digital asset commodities (as described herein), for Defendants' own accounts or for any account in which they have a direct or indirect interest;

    c.    having any commodity interests or digital asset commodities traded on Defendants' behalf;

    d.    controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital asset commodities;

    e.    soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests or digital asset commodities;

    f.    applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022);

    g.    acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9).

22

## III.    DISGORGEMENT AND CIVIL MONETARY PENALTY

**A.    Disgorgement**

81.    Defendants shall pay, jointly and severally, disgorgement in the amount of three million, nine hundred twelve thousand, two hundred twenty-two dollars ($3,912,220) ("Disgorgement Obligation"), representing the gains received in connection with the violations described above. If the Disgorgement Obligation is not paid immediately, then post-judgment interest shall accrue on the Disgorgement Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

82.    Defendants shall pay their Disgorgement Obligation and any post-judgment interest by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> Division of Enforcement
> 6500 S. MacArthur Blvd.
> HQ Room 266
> Oklahoma City, OK 73169
> 9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Tonia King or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Defendants shall accompany payment of the Disgorgement Obligation with a cover letter that identifies Defendants and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief

Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

**B.  Civil Monetary Penalty**

83.    Defendants shall pay, jointly and severally, a civil monetary penalty of triple the monetary gains to Defendants in the amount of eleven million, seven hundred thirty-six thousand, six hundred sixty dollars ($11,736,660) ("CMP Obligation").  If the CMP Obligation is not paid immediately, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

84.    Defendants shall pay their CMP Obligation and any post-judgment interest, by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> Division of Enforcement
> 6500 S. MacArthur Blvd.
> HQ Room 266
> Oklahoma City, OK 73169
> 9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Tonia King or her successor at the address above to receive payment instructions and shall fully comply with those instructions.  Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies Defendants and the name and docket number of this proceeding.  Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial

Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

## C.    Provisions Related to Monetary Sanctions

85.    Partial Satisfaction:  Acceptance by the Commission/CFTC of any partial payment of Defendants' Disgorgement Obligation or CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission/CFTC's right to seek to compel payment of any remaining balance.

## IV.    Miscellaneous Provisions

86.    Notice:  All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

> Robert T. Howell
> Deputy Director, Division of Enforcement
> Commodity Futures Trading Commission
> 77 W. Jackson Boulevard, Suite 800
> Chicago, IL 60604

Notice to Defendants:

> adamtodd@yahoo.com

All such notices to the Commission shall reference the name and docket number of this action.

87.    Change of Address/Phone:  Until such time as Defendants satisfy in full their Disgorgement Obligation and CMP Obligation as set forth in this Order, Defendants shall provide written notice to the Commission by certified mail of any change to his telephone number and mailing address within ten calendar days of the change.

88.    Invalidation:  If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

25

89.     Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by Defendants to modify or for relief from the terms of this Order.

90.     Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Order shall be binding upon Defendants, upon any person under the authority or control of any of the Defendants, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendants.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this *Order for Final Judgment by Default, Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief* forthwith and without further notice.

**IT IS SO ORDERED** on this _____day of _____, **[FILL-IN]**.


_____
**Judge Roy K. Altman**

**UNITED STATES DISTRICT JUDGE**